[Cite as *State ex rel. Terry v. The Andersons, Inc.*, 2014-Ohio-4169.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [State ex rel.]  Roy L. Terry, | : | |
| Relator, | : | |
| v. | : | No.  13AP-652 |
| The Andersons, Inc. and Industrial Commission of Ohio, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

D E C I S I O N

Rendered on September 23, 2014

*Gallon, Takacs, Boissoneault & Schaffer Co. L.P.A.,* and *Theodore A. Bowman,* for relator.

*Marshall & Melhorn, LLC,* and *Michael S. Scalzo,* for respondent The Andersons, Inc.

*Michael DeWine*, Attorney General, and *Colleen C. Erdman*, for respondent Industrial Commission of Ohio.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

TYACK, J.

{¶ 1}  Roy L. Terry filed this action in mandamus, seeking a writ to compel the Industrial Commission of Ohio ("commission"), to grant his application for permanent total disability ("PTD") compensation.

{¶ 2}  In accord with Loc.R. 13(M) of the Tenth District Court of Appeals, the case was referred to a magistrate to conduct appropriate proceedings.  The parties stipulated the pertinent evidence and filed briefs.  The magistrate then issued a magistrate's

decision, appended hereto, which contains detailed findings of fact and conclusions of law. The magistrate's decision includes a recommendation that we grant a limited writ of mandamus compelling the commission to vacate its order denying PTD compensation and to revisit the application because of mistakes by the staff hearing officer ("SHO") who addressed the application earlier.

{¶ 3} Counsel for the commission has filed objections to the magistrate's decision. Counsel for The Andersons, Inc., Roy L. Terry's former employer, has also filed objections to the magistrate's decision. Counsel for Roy L. Terry has filed a memorandum in response. The case is now before the court for a full, independent review.

{¶ 4} Terry was seriously injured in 2006 when a co-worker dropped an angle iron weighing as much as 90 lbs. on his head. He suffered brain damage. He went back to work on restricted duty soon thereafter, but a co-worker noticed Terry's reaction time was slowed. The Safety Department at The Andersons recommended that Terry remain off work for awhile.

{¶ 5} Terry had a cognitive screen followed by neuropsychological testing. He was then cleared to return to work, while taking Celebrex for headaches.

{¶ 6} Terry's headaches continued unabated which led to a change in medication, a referral to a psychiatrist and the care of a multi-disciplinary team in Michigan.

{¶ 7} The original diagnosis, in addition to a serious scalp laceration, was concussion and post-concussion syndrome, accompanied by headaches. He had ongoing pain and suffered from depression.

{¶ 8} Terry was hospitalized for a time to treat his physical and emotional difficulties. After the hospitalization, the treatment team cleared him to return to work on a half-time basis.

{¶ 9} In 2009, one of Terry's supervisors at The Andersons made the suggestion that Terry might consider long-term disability. Terry was working in an office, taking nine different medications and still suffering from headaches. Terry was depressed and apparently spent time talking to co-workers when he and the co-workers should be have been performing job responsibilities.

{¶ 10} In September 2012, Terry filed an application for PTD compensation, supported by reports from the treatment team which had been managing his case.

{¶ 11} The commission scheduled him for review with an independent medical examiner, Sanjay S. Shah, M.D. Dr. Shah reported that Terry had reached maximum medical improvement for his scalp laceration, cervical strain, paresthesia of his left hand and post-concussive syndrome with headaches. He reported that Terry still had significant tenderness of the cervical paravertebral muscles, but rated this as only a two to five percent impairment of the whole person.

{¶ 12} Dr. Shah rated the paresthesia of the left hand as only increasing impairment by one percent.

{¶ 13} The post-concussion syndrome added 10 percent and the headaches 3 percent more. Thus, the total impairment per Dr. Shah was only 19 percent. Dr. Shah felt Terry was physically capable of light work with restrictions.

{¶ 14} A separate examination was done by Robert A. Muehleisen, Ph.D., at the commission's request. Dr. Muehleisen reported a 28 percent whole person psychological impairment. Dr. Muehleisen also reported Terry was incapable of work.

{¶ 15} The Anderson's had Terry evaluated by Thomas E. Lieser, M.D. Dr. Lieser placed emphasis on the fact Terry could do household chores and drive a car. Dr. Leiser reported that Terry was capable of sustained remunerative employment due to Terry's ability to perform such tasks.

{¶ 16} The Anderson's also had Terry evaluated by Michael A. Murphy, Ph.D., who saw no serious or meaningful restrictions based on the recognized psychological conditions. Dr. Murphy felt Terry's depression was mild and stable.

{¶ 17} The Anderson's also obtained a report from Ann Okuley, M.Ed., who felt that Terry could return to sustained and competitive employment. Okuley felt potential vocational accommodation needs had not been fully explored.

{¶ 18} An SHO who reviewed the extensive information in the file discounted the reports from the first three years of treatment. The SHO felt Terry had not made sufficient efforts at vocational rehabilitation since 2009. The SHO also relied upon Dr. Lieser's report which in turn relied on Terry's ability to drive a car and do household chores. In short, the SHO accepted all of The Anderson's reports as credible.

{¶ 19} Our magistrate accurately addresses the reasons that Terry did not do more in the pursuit of vocational rehabilitation. Specifically, Terry's treatment team did not feel Terry's pain was under control.

{¶ 20} Further, our magistrate correctly addresses the SHO's view of the early treatment and resulting reports as "stale." The magistrate also properly discussed the report of Barbaranne Branca, M.D., Ph.D, whose report addresses the breaks in Terry's attempts to return to work.

{¶ 21} The commission in its objections to the magistrate's decision asserts that the SHO's extensive discussion of a minimal job search and no vocational rehabilitation after Terry's attempt to perform office duties at The Anderson's should be discounted and the SHO's order should be affirmed because of the acceptance of Dr. Shah's report and the information from experts acquired by The Anderson's. We are not persuaded that the SHO's heavy reliance on vocational rehabilitation did not govern the SHO's final and bottom line. We also note that our magistrate is not recommending a full writ of mandamus, but a limited writ of mandamus for review of the merits of the application for PTD compensation without an inaccurate verdict of staleness. If a new SHO is persuaded of the credibility of Dr. Lieser and the other experts retained by The Anderson's, then a new SHO would no doubt reach the same result and deny PTD compensation. If the new SHO is not persuaded that the ability to drive a car and do household chores demonstrates full mental clarity, the new SHO might reject Dr. Lieser's opinion.

{¶ 22} The commission also asserts that the early medical evidence was stale in fact. We reject this assertion for the reasons contained in the magistrate's decision. A recent medical report is required to put an application for PTD compensation on the table before the commission, but does not make the earlier evidence irrelevant to the merits of the application.

{¶ 23} Both of the commission's objections are overruled.

{¶ 24} The Anderson's filed a total of five objections which address the same issues as those argued on behalf of the commission, only using more words. We believe the magistrate's decision correctly addressed the issues also contested by The Anderson's and discussed by the panel above.

{¶ 25} We overrule the objections filed on behalf of The Anderson's.

{¶ 26}  We, therefore, adopt the findings of fact and conclusions of law contained in the magistrate's decision.  We grant a writ of mandamus compelling the commission to vacate its denial of Roy L. Terry's application for PTD compensation and further compelling the commission to consider all the evidence before it before adjudicating the merits of the application.

*Objections overruled; writ granted.*

KLATT and DORRIAN, JJ., concur.

# A P P E N D I X

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [State ex rel.] Roy L. Terry, | : | |
| Relator, | : | |
| v. | : | No. 13AP-652 |
| The Andersons, Inc. and Industrial Commission of Ohio, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

---

## M A G I S T R A T E ' S   D E C I S I O N

### Rendered on May 12, 2014

---

*Gallon, Takacs, Boissoneault & Schaffer Co. L.P.A.,* **and** *Theodore A. Bowman*, **for relator.**

*Marshall & Melhorn, LLC,* **and** *Michael S. Scalzo,* **for respondent The Andersons, Inc.**

*Michael DeWine*, **Attorney General, and** *Colleen C. Erdman*, **for respondent Industrial Commission of Ohio.**

---

### IN MANDAMUS

{¶ 27} In this original action, relator, Roy L. Terry, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate the May 20, 2013 order of its staff hearing officer ("SHO") that denies relator's application for

permanent total disability ("PTD") compensation, and to enter an order granting the compensation.

Findings of Fact:

{¶ 28} 1. On October 9, 2006, relator sustained an industrial injury while employed as a crew leader and welder in the railcar repair shop operated by respondent, The Andersons's Inc. ("The Andersons" or "employer"), a self-insured employer under Ohio's workers' compensation laws. On that date, a co-worker dropped a heavy angle iron that struck relator on his head.

{¶ 29} The industrial claim (No. 06-891101) is allowed for:

> Scalp laceration; cervical strain; paraesthesia to left hand; post-concussion syndrome with headache; mood disorder characterized by major depression; cognitive disorder; sleep disorder.

{¶ 30} 2. On the date of injury, relator was treated in the emergency room at St. Luke's Hospital, located in Maumee, Ohio. A CT scan of the head was normal. Relator continued with follow-up treatment for a couple of weeks at the occupational health clinic at St. Luke's.

{¶ 31} 3. In early November 2006, relator was initially evaluated by Steven Farrell, M.D., at the University of Toledo Medical Center.

{¶ 32} 4. On November 7, 2006, Dr. Farrell wrote:

> Currently, he notes that his main complaints are that of being unfocussed and being cloudy or hazy at times when doing cognitive tasks. He believes that his reaction time is somewhat decreased. He also has some constant headaches. He has no indication of nausea, vomiting, photophobia, or phonophobia. He will have some occasional numbness in his left arm, but denies any pain or weakness. With regard to his home activities, he will have difficulty with reading at times. He also has some difficulty with exertional activities such as playing basketball with his son. He was sent back to work on restricted duty for approximately 1 week, but his coworker noticed that his reaction time was decreased and therefore, the Safety Department of the Anderson's had recommended that he remain off work at this point.

{¶ 33} 5. On December 19, 2006, Dr. Farrell wrote:

Roy Lee Terry was seen in follow up today for his previous complaints that were consistent with post concussive syndrome. In the past, Mr. Terry had a traumatic brain injury, but had recovered moderately well. At his initial visit he was complaining of some headaches. We had put him on a restricted work schedule and requested a cognitive screen. The cognitive screen recommended neuropsychological testing. He follows up today for the results of that testing. Overall, he continues to do fairly well on his restricted duty position. He does have headaches roughly 3 times per week, which has been somewhat difficult for him. He does take over-the-counter aspirin for the headaches. He denies any other symptoms in any of the 4 extremities. He also denies any true weakness, numbness, or tingling in any of the extremities.

During today's 30-minute visit, we did review the neuropsychological testing. He did quite well from their standpoint and was released from a full duty standpoint. They were recommending some further treatment for the post concussive headache.

At this point, after extensive discussion with the patient, we have made a plan to return him to full unrestricted duty as of 12/28/2006. Also, we will have him begin Celebrex 200 mg daily for the headaches.

{¶ 34} 6. On March 21, 2007, relator was initially examined by neurologist Vicki Ramsey-Williams, Ph.D., at the University of Toledo Medical Center.

{¶ 35} 7. On July 2, 2008, Dr. Ramsey-Williams wrote:

The patient is still working, and plans to continue working.

* * *

IMPRESSION/PLAN: The patient is a 55-year-old man with a history of post concussive headache syndrome, and chronic daily headaches which are refractory to treatment. The patient tells me that he is soon to see a headache specialist in Michigan, with which I agree. Since his Cymbalta has only caused him drowsiness and no beneficial effects for his depression, I have asked him to discontinue Cymbalta and try Wellbutrin SR 150 mg daily. I also note that in a previous neuropsychological evaluation dated December 2006, suggestion was made to refer him to psychiatry. This referral

was made today for further assessment of depression and chronic pain.

{¶ 36} 8. In July 2008, relator came under the care of a multi-disciplinary team of physicians, psychologists, neuropsychologists, and physical therapist at the Michigan Head-Pain & Neurological Institute ("MHNI"). From December 8, to December 17, 2008, relator was hospitalized at the Chelsea Community Hospital in Chelsea, Michigan.

{¶ 37} 9. In a five-page discharge summary, Joel R. Saper, M.D., wrote:

> The patient was hospitalized on a specialized medical unit for acute medical treatment. The unit is a neurologically oriented treatment facility for intractable head and neck pain. It provides 24-hour acute nursing care, daily medical rounds, and a team of specially trained staff members. It is under the direction of Dr. Joel R. Saper and is affiliated with the Michigan Head Pain and Neurological Institute (MHNI).
>
> **CLINICAL STATUS AT DISCHARGE:** The patient is moderately improved from preadmission status and is clinically stable.
>
> **DISCHARGE DIAGNOSES:**
> **Pain Diagnoses/Other Principle Diagnoses:**
>
> [One] Posttraumatic migraine variant intractable.
> [Two] Possible cervicogenic headache factors affecting daily head pain.
> [Three] Degenerative disc disease C-spine (by MRI).
> [Four] Chronic white matter infarction, right corona radiata, unlikely clinical significance (repeat testing is advised).
>
> **Psychology Diagnoses:**
> [One] Adjustment disorder with anxiety and depressed mood.
> [Two] Dyssomnia, not otherwise specified.
>
> **Other Diagnoses:**
> [One] History of hypertension, treated.
> [Two] History of hyperlipidemia and insomnia.
>
> * * *
>
> **PROCEDURES:** During hospitalization the patient was provided cervical facet blocks on December 16, 2008, by Dr. Moheyuddin. This was moderately beneficial. The patient

had also undergone bilateral occipital nerve blocks and trigger point injection of the vertex scalp by Dr. Austad which were also beneficial procedures.

* * *

**MEDICATIONS ADMINISTERED DURING HOSP-ITALIZATION (A PARTIAL LIST):** The patient seemed to have some benefit from oral Robaxin, intravenous Ketoralac and possibly the preventative treatment with Lyrica. Reglan may have also been beneficial and will continue as an h.s. p.r.n. medication.

**KEY CONSIDERATIONS:** During hospitalization, the patient was able to report moderate improvement by the time of discharge both by the medications and the anesthesiological interventions.

{¶ 38} 10. In a two-page "Psychology Discharge Report," psychologist Brent Coy, Ph.D., wrote:

**SUMMARY:** At the time of discharge, the patient reported significant improvement in pain control with an associated increase in his functional activity level. He attributed his improvement in pain control to changes in his medication regimen as well as to nerve block procedures. He will continue to work with MHNI for ongoing medical and psychological services.

Throughout treatment, the patient was open to discussions concerning the relationship between pain and emotions and behavior. He presented with a mild to moderate level of depressed mood and anxiety related to his pain and negative impact on his quality of life. He has been proactive in coping with his pain and giving good effort to try to maintain employment despite his pain condition. Counseling sessions were used to provide support and reinforce cognitive behavioral coping skills for pain and stress management including cognitive restructuring, distraction, relaxation techniques, positive self talk, and exercise. The patient was active on the unit throughout treatment, attending classes and socializing with other patients. He was very open to using a variety of behavioral coping skills to help with mood and pain management.

At discharge, the patient was pleased with his positive response to treatment. His pain was better controlled and

there was a noticeable improvement in his mood. He was given some time off of work by the medical team until he returns back to MHNI to meet with Dr. Rozen. He is motivated to eventually return back to work. At discharge he was encouraged to avoid medication overuse that could lead to analgesic rebound, to practice relaxation techniques and other behavioral coping skills on a daily basis, and to prioritize and pace daily activities. With regard to psychological follow up, the patient will meet with Dr. Branca and Dr. Lake at MHNI to help further reinforce behavioral coping skills for pain and stress management as well as to further explore the possibility of cognitive changes resulting from his head injury.

{¶ 39} 11. By letter dated March 27, 2009, psychologist Alvin E. Lake III, Ph.D., and neurologist Henry C. Hooker, M.D., both MHNI employees, wrote:

We are authorizing Roy Terry to return to work on 3/31/09 in a transitional position in an office environment with some possible travel to do railroad car inspection, as outlined in the previous information that had been sent to us. We are initially recommending that he return to work for 4 hours a day (20 hours a week) as part of the transition, with scheduled consecutive hours to be determined by his work place. He is scheduled to see Dr. Lake for another consultation on April 10th, and we will re-evaluate at that time any increase in his work hours on the initial success of the transition.

Please note that he does continue to suffer moderate to severe daily headaches that have not shown significant sustained response to treatment to date. We also remain concerned about any possible neurocognitive deficits from his injury where reportedly a 90-lb. piece of steel slipped and hit his hard hat in the left occipital area and then slid off and per his report hit his unprotected head. Consequently we have requested authorization for a full neurocognitive test battery by Dr. Branca so we can better determine any neurocognitive deficits resulting from the injury that may need to be addressed.

{¶ 40} 12. On June 5, 2009, Dr. Lake telephoned Wayne Willis, relator's supervisor at The Anderson's. In a two-page memorandum, Dr. Lake describes the conversation:

***Reason For Phone Call:*** I placed a call to Mr. Willis after talking with Roy at my last visit with him on 05/21/09 about the possibility of getting some perspective on his work performance. Roy also told me at that time that Mr. Willis had raised the possibility of long-term disability with Roy, and I wanted Mr. Willis' opinion on that.

***Background:*** Mr. Willis took position as the Anderson's shop manager about one-and-a-half years ago subsequent to Roy's injury, but while Roy was still working in his original position at the worksite. He also had the opportunity to go to the back office where Roy is currently working under restricted conditions and service performance.

***Patient's Functioning in Yard Subsequent to Injury, but Prior to Starting Treatment at MHNI:*** Mr. Willis stated that when he came on the job he was told about Roy's condition, was not aware of the entire situation. There were times that Roy complained about headaches, particularly in the morning. He stated Roy was required to wear hearing protectors because of his hearing sensitivity but complained about them. He stated they had to give him constant reminders to wear them but he would take them off at times.

Prior to starting treatment here, Roy had approached Mr. Willis, telling him, "I can't take it," and was using all his vacation to go to the doctors' appointments. They subsequently made a decision to refer him on to us for further treatment.

***Current Functioning:*** He states that "now there is a totally different Roy—he holds his head between his legs, no motivation." He stated he called him into the office one day and was very concerned, and Roy showed him nine different medications. He stated Roy told him, and he surmised that Roy was "very depressed."

He stated he had told Roy at one point, "I don't know what else to do," and Roy had suggested that "things are going off the deep end." He confirmed that he had raised with Roy the possibility of a long-term disability, but pointed out this was the decision for the insurance company (and his doctors).

He states every time he sees him he will ask him how he is doing. He will see Roy sitting with his "head hanging" but saying, "I'm okay...I'm okay[.]" He appears fatigued, but not necessarily sleepy.

He also stated he recently had to confront Roy with the observation that he is a "distraction" to other people getting their work done—people like him, will start talking to him, and he pointed this out to Roy who agreed and expressed understanding. He states he just seems worn out.

* * *

***Actions Taken:*** I am forwarding this note to Roy's neurologist here, Dr. Hooker, and Dr. Branca, our neuropsychologist who will be completing neurocognitive testing in July, and Roy's physical therapist, Ellen Lecureux, PT. We will discuss this case further as a group.

{¶ 41} 13. On July 20 and 21, 2009, relator was evaluated by psychiatrist Barbaranne Branca, Ph.D., who is the neuropsychology supervisor at MHNI. On page 16 of her 17-page narrative report, under "Treatment Recommendations," Dr. Branca wrote:

**TREATMENT RECOMMENDATIONS:**

* * *

[Three] VOCATIONAL EVALUATION AND ASSESSMENT: Deferred. It is recommended that this be deferred until he has adequate pain management and adequate management of affective disturbance. After this is obtained and upon recommendation of his MHNI multidisciplinary team, it is recommended that he be referred for vocational evaluation and assessment to Robert Ancell, Ph.D. & Associates.

{¶ 42} 14. In a three-page letter or report dated September 5, 2012, Drs. Lake and James R. Weintrab, D.O., jointly state:

This letter is in support of Mr. Terry's Application for Compensation for Permanent Total Disability. As noted in the Application, we believe that Mr. Terry's physical and mental impairments resulting from the conditions in his claims have permanently precluded him from returning to his former position of employment, that he is permanently and totally disabled as a result of these injuries. Mr. Terry's case was also discussed in a multidisciplinary meeting on 6/8/12 with our Director, Joel R. Saper, M.D., F.A.C.P., F.A.A.N., and clinical staff who have known Mr. Terry over the past several years, and it was our consensus opinion that he is permanently and totally disabled.

Mr. Terry was initially evaluated at our center on 7/24/08 for treatment of symptoms dating from a work-related injury on 10/9/06, where an approximately 50-60 lb. piece of angle iron fell from 12 feet and hit the patient in the back of the head. He was wearing a hard hat, in a squatting position, and the angle iron knocked the hard hat off, leaving him with a permanent scar. He has consistently attended sessions. An effort to assist him in returning to work in a part-time sedentary position in mid-2009 was unsuccessful in increasing productivity despite his consistent attendance. He was hospitalized on our inpatient Head Pain Treatment Unit from 12/8 to 12/17/08 and discharged moderately improved, which included intensive intravenous medications as well as nerve blocks.

Based on our communications with his shop manager when we had attempted to return him to work, he had been an excellent worker prior to this injury. He had made an effort to continue working at his former position immediately after the injury but had other employees cover for him at times when he would take breaks, and his headaches became increasingly poorly controlled. A conversation with the shop manager on 6/5/09 indicated that Mr. Terry had become totally different and was not functioning adequately even in a sedentary position.

He has received multiple medications. As of his appointment at our center today, his treatments for pain and related mood disturbance include Lyrica 200 mg. 3 times a day, Celexa 40 mg. in the morning, Robaxin 1500 mg. 3 times a day, Sinequan 50 mg. at 7:00 p.m. with an additional 75 mg. at bedtime. He also takes melatonin 3-6 mg. at bedtime. Medications he takes on an as-needed basis include Vistaril 25 mg. 3 times a day (3 times per week), Frova 2.5 mg. 3 per day (2 times a week), and Anaprox 550 mg. 3 per day (3 times per week). As noted on page 2 of the Application for Compensation for Permanent Total Disability, Roy notes that he has received "many types of nerve blocks," but he was unsure about the dates or types of blocks. He has not shown sustained benefit from any of the following nerve blocks, and we have elected to pursue a primary medication program.

* * *

Mr. Terry also completed a Comprehensive Neuro-psychological Evaluation on 7/20 and 7/21/09 at our center

by Barbaranne Branca, Ph.D., ABN. A copy of the 17-page report is enclosed. It was Dr. Branca's impression (page 12) that his performance was "mildly abnormal" but that it was "a valid profile, demonstrating good effort, despite the presence of pain and increasing pain levels during testing. She had recommended that we defer vocational evaluation and rehabilitation efforts until his pain had come under better control, which has unfortunately never happened.

We believe Mr. Terry has reached maximum medical improvement but does benefit from continuing medical management of his headache problem and cognitive-behavioral psychotherapy.

{¶ 43} 15. On September 13, 2012, relator filed an application for PTD compensation. In support, relator submitted the September 5, 2012 joint report of Drs. Lake and Weintrab.

{¶ 44} On December 5, 2012, at the commission's request, relator was examined by Sanjay S. Shah, M.D. In his six-page narrative report, Dr. Shah states:

**[One] Has the injured worker reached maximum medical improvement with regards to each of the specified allowed conditions?**

In regards to the specified condition of scalp laceration, cervical strain, paresthesia of the left hand, and post-concussive syndrome with headaches, he has reached maximum medical improvement for each of these allowed conditions as he has been seen by multiple physicians and has had multiple treatments done, and he is now being treated with medical management.

**[Two] Based on the *AMA Guides, Fifth Edition with reference to the Industrial Commission Medical Examination Manual,* provide the estimated percentage of whole person impairment arising from each of the allowed conditions.**

A. For allowed condition of scalp laceration: This is resolved. There currently [is] no residual abnormalities. As a result, he has 0% impairment for the allowed condition of scalp laceration.

B. For cervical strain: He continues with significant tenderness of the cervical paravertebral muscles with some

noted guarding and spasms and loss of range of motion. He also notes non-verifiable radicular complaints with radiation to the left upper extremity. As a result, using Table 15.5, criteria for rating impairment due to cervical disorders, he falls into DRE cervical category 2 or 5% whole person impairment for the allowed condition of cervical strain.

C. For paresthesia of the left hand: He continues with some abnormal sensory deficits in the posterior left hand. It is difficult to assess whether this is related to any specific peripheral nerve or root. However, considering that he does have decrease[d] sensation of the left posterior hand, I would grade this using Table 16.10 at a grade 4 with distorted superficial tactile sensibility with or without minimal abnormal sensation or pain that is forgotten during activity and would use a 5% maximum upper extremity impairment considering a possible C7 middle trunk or radial sensory abnormality both of which would have a maximum of 5% sensory deficit and therefore, since he has a maximum 5% impairment with a grade 4 deficit (a 1-25% deficit), he would have a 1% impairment for the paresthesia of the left hand.

D. For post-concussive syndrome with headaches, I would us Table 13.5 and 13.6 on page 320, as this would be related to his traumatic brain injury/post-concussive syndrome. He is noted to have slight forgetfulness. He is fully oriented. He has some difficulty with problem solving. He has slight impairment in community affairs. He has some impairment in home and hobbies. He is fully capable of self-care. As a result, he would fall into CDR 0.5 or Class 1 impairment. As a result, he would have a 10% impairment of the whole person for post-concussive syndrome. I would also add 3% impairment due to continued headaches.

E. As a result, using the combined value chart, he would have 0% for scalp laceration, 5% for cervical strain, 1% for paresthesia of the left hand, and 10% for post-concussive syndrome or a 16% whole person impairment for the allowed conditions and I would then add a 3% for continued headaches.

As a result, it is my opinion that the combined whole person impairment for the allowed conditions in this claim is 19%.

[Three] * * * Considering the claimant's allowed conditions, he would be able to do light work with added limitations of avoidance of overhead activities due to his neck pain. Also,

due to memory difficulties and continued headaches, he should avoid activities that require increased safety and balance which would include machinery, ladders, or working at high levels, such as scaffolding, etc.

(Emphasis sic.)

{¶ 45} 16. On December 10, 2012, Dr. Shah completed a Physical Strength Rating form. The form asks the physician to indicate by his mark the type of work, if any, that the claimant can do. Under the commission's definition of light work, in the space provided, Dr. Shah wrote in his own hand the further limitations regarding light work.

{¶ 46} 17. On December 10, 2012, at the commission's request, relator was examined by psychologist Robert A. Muehleisen, Ph.D. In his seven-page narrative report, Dr. Muehleisen opines:

> [One] This examiner's opinion is that Mr. Terry remains at maximum medical improvement with respect to his allowed mood disorder, cognitive disorder, and sleep disorder.
>
> [Two] Based on *AMA Guides, Second and Fifth Edition,* and with reference to the Industrial Commission Medical Examination Manual, Mr. Terry exhibits 28% whole person psychological impairment arising the combination of his allowed mood disorder characterized by major depressive, cognitive disorder, and sleep disorder.

(Emphasis sic.)

{¶ 47} 18. On December 18, 2012, Dr. Muehleisen completed a form captioned "Occupational Activity Assessment Mental & Behavioral Examination." On the form, Dr. Muehleisen indicated by his mark: "This Injured Worker is incapable of work."

{¶ 48} 19. On November 5, 2012, at the employer's request, relator was examined by Thomas E. Lieser, M.D. In his nine-page narrative report, Dr. Lieser opines:

> <u>Discussion</u>:
> The current medication regimen does not appear to reflect the recommendations previously made to discontinue the Lyrica, which is known to have significant sedating side effects, although the claimant appears to have been placed on a tapering regimen for the Lyrica.
>
> Clearly the claimant is capable of performing chores about the house and driving his car; functions which are

moderately demanding in both attention, as well as spatial/visual coordination. In other words, he would be clearly capable of maintaining sustained remunerative employment in light of his ability to accomplish these tasks, and in light of the clinical exam findings noted today.

The allowed conditions of scalp laceration, cervical strain, and paresthesias to the left hand are resolved. The claimant continues to manage headache, which is currently stable under his current medication regimen, and a mood disorder characterized by depression, cognitive disorder, and sleep disorder. These are all manageable and do not prevent work activity. This is also supported by several evaluations.

Conclusions:
Based on today's evaluation and within a reasonable degree of medical certainty, I would offer the following:

[One] Based on the allowed conditions in this claim, Mr. Roy Terry is capable of engaging in sustained remunerative employment. There is an absence of peripheral neurologic deficit. He has had multiple imaging studies showing no evidence of acute injury to the cervical spine or the brain as a result of the 10/9/06 incident, and he is capable of engaging in interactive conversation. His examination does reveal modest deficits in cervical spine motion, however, his reported activity level is clearly consistent with the ability to perform sustained remunerative employment.

[Two] Work activity ought to be limited to avoidance of overhead activity.

{¶ 49} 20. On November 12, 2012, at the employer's request, relator was examined by psychologist Michael A. Murphy, Ph.D. In his eight-page narrative report, Dr. Murphy opines:

I see no serious or meaningful restrictions based on his recognized DSM-IV conditions. The Injured Worker is of average intelligence. Objective medical testing found no clinical evidence of brain abnormality. His residual functioning is mild. The AMA guides to the Evaluation of Permanent Impairment, 5th Edition, defines mild impairment as that of an individual who is capable of most meaningful activities and functioning. His depression is stable and mild.

The Injured Worker is capable of employment in a normal climate of stress, adequate supervision, and non-novel work activity. He is not permanently and totally disabled as a result of his recognized DSM-IV conditions.

The Injured Worker's disturbance of sleep is symptomatic of depression and/or other medical conditions. Recall, he is diagnosed with hypertension and does report a bilateral carpal tunnel BWC claim (1991).

{¶ 50} 21. Earlier, on February 5, 2012, at the employer's request, vocational expert Ann Okuley, M.Ed., issued an eight-page narrative report in which she opines:

In my professional opinion and based on the medical documentation provided, Mr. Terry has the potential to return to sustained and competitive employment with the appropriate vocational rehabilitation planning and support. Mr. Terry's current mental and physical limitations are not clearly defined throughout the file due to various opinions from various professionals. Potential vocational accommodation needs do not appear to have been fully explored.

{¶ 51} 22. Following a May 20, 2013 hearing, an SHO issued an order denying relator's PTD application. The SHO's order explains:

The Staff Hearing Officer reviewed and considered all medical evidence within the time frames of the Ohio Administrative Code 4121-3-34 as to timelines for submission of evidence relevant to permanent and total disability. The Staff Hearing Officer finds much of the evidence relied upon by the Injured Worker is from 2009 which is deemed stale and outside the regulatory requirements for reliance upon in the matter of permanent and total disability. Specifically, the report of Dr. Branca. This is a multi-disciplinary exam. The Injured Worker alleges that Dr. Lake, Ph.D., and Dr. Weintraub [sic], D.O., indicate that this report indicated that they should defer vocational rehabilitation until the Injured Worker's pain comes under better control and Dr. Lake and Dr. Weintraub [sic] indicates that never happened. The Staff Hearing Officer did not find that statement in Dr. Branca's report. However, if it is present, that would be the Injured Worker's condition as of 2009. The opinion with regard to his ability to participate in vocational rehabilitation from 2009 is not an indication of his condition or ability to participate in Vocational rehabilitation in 2013.

The Injured Worker made a significant attempt to return to his former position of employment and light duty work with this Employer in 2009. However, after his departure from work in the light duty capacity with this Employer, the Injured Worker pursued no other vocational rehabilitation options and performed no other types of job search. As a result, the Staff Hearing Officer finds that the Injured Worker has not met the criteria under Speelman v. Industrial Commission 73 Ohio App.3d 757 (1992) or State ex rel. Bowling v. National Can Corporation 77 Ohio St.3d 148 (1996). The Injured Worker has not made an attempt at vocational rehabilitation and has not looked for any other type of light duty work within his restrictions since 2009. As a result of the case law and the court findings in Speelman v. Industrial Commission, [State ex rel.] Bowling v. National Can Corporation, B.F. Goodrich Company v. Industrial Commission 73 Ohio St.3d 525 (1995), Wilson v. Industrial Commission 80 Ohio St.3d 250 (1997), and Cunningham v. Industrial Commission 91 Ohio St.3d 261 (2001), the Injured Worker is not eligible for permanent and total disability benefits. Further, in State ex rel. Lawson v. Industrial Commission Tenth District, No. 09AP-1190 2010-Ohio-460, the Court held that an attempt to return to work alone is insufficient for the Injured Worker to carry his burden of establishing a preclusion of vocational rehabilitation.

The Staff Hearing Officer finds this application is denied on the merits. The Staff Hearing Officer finds the preponderance of the medical evidence establishes that the Injured Worker is not permanently and totally disabled nor precluded from performing sustained remunerative work activity. Recent notes of which indicate that the Injured Worker's headache condition has in fact improved. This includes the note of 09/05/2012 that indicates "he appeared in reasonably good spirits, and his headache control was stable with current medications."

The Staff Hearing Officer relies upon the report and opinion of Dr. [Lieser], M.D., dated 11/05/2012. Dr. [Lieser] notes that the Injured Worker is capable of performing chores around the house, and driving his car, both functions which are moderately demanding in both attention, as well as, spatial/visual coordination. In other words, he would be clearly capable of maintaining sustained remunerative employment in light of his ability to accomplish these tasks, and in light of Dr. [Lieser's] clinical exam findings. Dr.

[Lieser] notes that the scalp laceration, cervical strain, and paresthesia to the left hand are resolved. The Injured Worker continues to manage headaches, which are currently stable under the current medication regime and a mood disorder characterized by depression, cognitive disorder and sleep disorder. Dr. [Lieser] opines that these are all manageable and do not prevent work activity. Dr. [Lieser] finds that this is also supported by several of the other evaluations. Dr. [Lieser] finds an absence of peripheral neurologic deficit. The multiple imaging studies show no evidence of acute injury to the cervical spine or brain as a result of the work related injury. He is capable of engaging and interacting in conversation. His exam revealed modest deficits in cervical spine motion, however, his reported activity level is clearly consistent with an ability to perform sustained remunerative work activity. Dr. [Lieser] notes that the work activity ought to be limited to avoidance of overhead activity.

The Staff Hearing Officer also relies upon the report and opinion of Dr. Shah, dated 12/05/2012. Dr. Shah took a full and complete history of the Injured Worker, reviewed evidence on file, and performed a physical examination. As a result of the above, Dr. Shah opines that the Injured Worker has reached a level of maximum medical improvement with regard to the allowed physical conditions in the claim. Dr. Shah opines that related solely to the allowed physical conditions in the claim the Injured Worker is capable of performing light work and limitation of overhead activity due to neck pain. Due to memory difficulties and headaches, he should avoid activities that require increased safety and balance which would include machinery, ladders, or working at high levels such as scaffolding. Dr. Shah opines that the Injured Worker is physically capable of performing sustained remunerative employment at the light duty level.

This order is also based upon the report and opinion of Dr. Murphy, Ph.D. Dr. Murphy took a full and complete history of the Injured Worker, reviewed psychology evidence on file and performed a mental status evaluation. Dr. Murphy finds that the residual functional (impairments) related to the allowed psychological conditions are: ... activities of daily living, mild; social interaction, mild; adaptation, mild; concentration, persistence and pace, mild. Dr. Murphy notes several unrelated stressors that impact the Injured Worker's condition. Dr. Murphy notes that the Injured Worker does report mildly reduced short-term memory; however, he is heavily medicated. Dr. Murphy opines that the Injured

Worker's cognitive disorder is mild and negligible at best. He is not precluded from employment due to his cognitive disorder. Dr. Murphy goes on to opine that as to the depressive disorder it is not work prohibited. The Injured Worker is capable of repetitive well-structured work. Dr. Murphy opines that the Injured Worker's residual functional impairment is mild. The AMA Guide for Evaluation of Permanent Partial Impairment, 5th Edition, defines mild impairment as that of an individual who is capable of most meaningful activities and functioning. The Injured Worker's depression is stable and mild. Dr. Murphy goes on to opine that the Injured Worker is capable of employment in a normal climate of stress, adequate supervision, and non-overhead work activity. He is not permanently and totally disabled on the basis of the allowed psychological conditions in the claim.

The Injured Worker is a 59 year old male whose date of birth is 06/23/1953. The Injured Worker is receiving social security disability benefits in the approximate amount of $1329.00 per month. The injured worker is a high school graduate and is capable of reading, writing and performing basic math. The Injured Worker has worked as a railroad man, food delivery driver, car man, sheet metal apprentice, warehouse manager, press operator, laborer, and railcar crew leader. The Injured Worker's position as a railcar crew leader included significant supervisory activities and resulted in transferrable skills from previous employment to other areas of employment.

The Staff Hearing Officer relies upon the report of Dr. [sic] Okuley, MEd. dated 02/05/2012. Dr. Okuley, MEd. is a vocational assessor and opines that the Injured Worker would have benefited from being able to attend vocational rehabilitation in person in order to obtain objective data regarding his interests, skills, abilities, and overall vocational functioning and explore options of returning to work of some kind. Dr. Okuley considered the medical evidence of limitations on file, as well as, the Injured Worker's vocational factors and finds that the Injured [W]orker has the potential to return to sustained and competitive employment with the appropriate vocational rehabilitation, planning and support. Dr. [sic] Okuley makes several recommendations with regard to the Injured Worker's return to the workforce and outlines a plan for same.

The Staff Hearing Officer finds that, based upon the physicians and psychologists identified in the body of this order, the Injured Worker is capable of performing activities of vocational rehabilitation, and sustained remunerative employment. The Injured Worker has neither availed himself at vocational rehabilitation nor has he performed any type of job search since he left light duty work in 2009. The Staff Hearing Officer finds that the Injured Worker's condition has improved since that time and he has not sought vocational rehabilitation or returned to the work force.

The Staff Hearing Officer finds the Injured Worker is not an older individual at the age of 59. His age is not a barrier to re-employment. Further, age alone is not a determinative factor in permanent and total disability, see [*State ex rel. DeZarn v. Indus. Comm.*, 74 Ohio St.3d 461 (1996)] and [*State ex rel. Moss v. Indus. Comm.*, 75 Ohio St.3d 414 (1996)]. The Injured Worker has a high school education and is capable of reading, writing and performing basic math. These are positive vocational factors. The Injured Worker has also developed transferrable skills from his former positions of employment that could be used in other areas of employment. This is also a positive vocational factor.

Therefore, based upon all of the above, the Staff Hearing Officer finds that the Injured Worker is not permanently and totally disabled, nor precluded from performing sustained remunerative work activity. Therefore, the IC-2 Application filed on 09/13/2012 is denied.

{¶ 52} 23. On July 29, 2013, relator, Roy L. Terry, filed this mandamus action.

Conclusions of Law:

{¶ 53} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.

### Basic Law:  Failure to Undergo Vocational Rehabilitation

{¶ 54} The Supreme Court of Ohio has repeatedly addressed the obligation of a PTD claimant to undergo opportunities for rehabilitation. *State ex rel. B.F. Goodrich Co. v. Indus. Comm.*, 73 Ohio St.3d 525 (1995); *State ex rel. Bowling v. Natl. Can Corp.*, 77 Ohio St.3d 148 (1996); *State ex rel. Wood v. Indus. Comm.*, 78 Ohio St.3d 414 (1997); *State ex rel. Wilson v. Indus. Comm.*, 80 Ohio St.3d 250 (1997); *State ex rel. Cunningham v. Indus. Comm.*, 91 Ohio St.3d 261 (2001).

{¶ 55} In *B.F. Goodrich,* the court states:

> [E]vidence of record indicates that claimant did not participate in rehabilitation services offered by the commission. There is no indication that claimant's lack of participation was based on a physician's medical advice, or on a vocational evaluation that concluded that she was intellectually, psychologically or emotionally incapable of retraining. Absent such evidence, the implication is that claimant simply chose not to avail herself of the opportunity to receive retraining and potential re-employment.
>
> The commission does not, nor should it, have the authority to force a claimant to participate in rehabilitation services. However, we are disturbed by the prospect that claimant may have simply decided to forgo retraining opportunities that could enhance re-employment opportunities. An award of permanent total disability compensation should be reserved for the most severely disabled workers and should be allowed only when there is no possibility for re-employment.

*Id.* at 529.

{¶ 56} In *Wilson,* the court states:

> We view permanent total disability compensation as compensation of last resort, to be awarded only when all reasonable avenues of accomplishing a return to sustained remunerative employment have failed. Thus, it is not unreasonable to expect a claimant to participate in return-to-work efforts to the best of his or her abilities or to take the initiative to improve reemployment potential. While extenuating circumstances can excuse a claimant's nonparticipation in reeducation or retraining efforts, claimants should no longer assume that a participatory role, or lack thereof, will go unscrutinized.

*Id.* at 253-54.

### Alternative Bases?

{¶ 57} Preliminarily, the magistrate addresses the commission's assertion here that the SHO's order presents alternative bases for denial of the PTD application. If it can be said that relator has challenged only one of two bases, he cannot show entitlement to a

writ of mandamus if the basis he has failed to challenge supports the commission's decision.

{¶ 58} Here, even if it can be said that the SHO's order endeavors to submit alternative bases for the decision, the SHO has incorporated the first basis into the second basis. Therefore, relator's challenge to the first basis necessarily challenges the second basis.

{¶ 59} In order are some observations regarding the SHO's order.

{¶ 60} The SHO's order begins with a two-paragraph determination that relator "is not eligible" for PTD compensation because it was found that relator failed to pursue vocational rehabilitation subsequent to his 2009 attempt to return to work at The Andersons. This two-paragraph determination that relator is ineligible for PTD compensation precedes the SHO's statement "this application is denied on the merits." Following the statement that the SHO is proceeding "on the merits," the paragraphs that follow determine residual functional capacity by specific reliance upon the reports of Drs. Lieser, Shah, and Murphy. Presumably, the report of Dr. Muehleisen was rejected because the report is not mentioned.

{¶ 61} Following a determination of residual functional capacity based upon the reports of Drs. Lieser, Shah, and Murphy, the order addresses the non-medical disability factors in the next four paragraphs. That is, the order discusses age, education, and work history, and states reliance upon the February 5, 2012 Okuley vocational report. In the third of the four paragraphs, the order revisits the earlier determination that relator has failed to pursue vocational rehabilitation or a job search since he left light-duty work in 2009. That is, in discussing the non-medical factors, the order appears to reconnect with the earlier determination that relator is ineligible for PTD compensation because he is found to have failed to pursue vocational rehabilitation after 2009.

{¶ 62} Analysis of the SHO's order is aided by reference to the commission's guidelines for adjudication of PTD applications found at Ohio Adm.Code 4121-3-34(D).

{¶ 63} Ohio Adm.Code 4121-3-34(D)(1)(d) provides:

> If, after hearing, the adjudicator finds that the injured worker voluntarily removed himself or herself from the work force, the injured worker shall be found not to be permanently and totally disabled. If evidence of voluntary removal or retirement is brought into issue, the adjudicator

shall consider evidence that is submitted of the injured worker's medical condition at or near the time of removal/retirement.

{¶ 64} Ohio Adm.Code 4121-3-34(D)(2) provides:

(a) If, after hearing, the adjudicator finds that the medical impairment resulting from the allowed condition(s) in the claim(s) prohibits the injured worker's return to the former position of employment as well as prohibits the injured worker from performing any sustained remunerative employment, the injured worker shall be found to be permanently and totally disabled, without reference to the vocational factors listed in paragraph (B)(3) of this rule.

(b) If, after hearing, the adjudicator finds that the injured worker, based on the medical impairment resulting from the allowed conditions is unable to return to the former position of employment but may be able to engage in sustained remunerative employment, the non-medical factors shall be considered by the adjudicator.

The non-medical factors that are to be reviewed are the injured worker's age, education, work record, and all other factors, such as physical, psychological, and sociological, that are contained within the record that might be important to the determination as to whether the injured worker may return to the job market by using past employment skills or those skills which may be reasonably developed. (Vocational factors are defined in paragraph (B) of this rule).

(c) If, after hearing and review of relevant vocational evidence and non-medical disability factors, as described in paragraph (D)(2)(b) of this rule the adjudicator finds that the injured worker can return to sustained remunerative employment by using past employment skills or those skills which may be reasonably developed through retraining or through rehabilitation, the injured worker shall be found not to be permanently and totally disabled.

{¶ 65} A failure to undergo vocational rehabilitation is not an independent basis for denial of a PTD application under Ohio Adm.Code 4121-3-34(D)'s guidelines. Rather, an alleged failure to undergo vocational rehabilitation can be a non-medical factor under Ohio Adm.Code 4121-3-34(D)(2)(b) and (c).

{¶ 66} However, voluntary removal from the workforce under Ohio Adm.Code 4121-3-34(D)(1)(d) is an independent basis for denial of a PTD application. Here, it can perhaps be argued that the SHO's two-paragraph determination that relator is ineligible for PTD compensation because he was found to have failed to pursue vocational rehabilitation or to have searched for work has similarities to a voluntary removal from the workforce. But the order does not purport to find a voluntary removal from the workforce and cannot be viewed as such.

{¶ 67} Consequently, we are left with a commission determination that improperly purports to present a failure to pursue vocational rehabilitation as an independent basis for denial of the PTD application.

{¶ 68} Given the above analysis, the magistrate concludes that the SHO's order must be viewed as presenting only one basis for denial of the PTD application and that basis is found at Ohio Adm.Code 4121-3-34(D)(2)(b) and (c), which requires review of the non-medical factors.

### Stale Evidence?

{¶ 69} The commission has the exclusive authority to evaluate evidentiary weight and credibility. *State ex rel. Burley v. Coil Packing, Inc.*, 31 Ohio St.3d 18 (1987). In explaining its decisions, the commission need not set forth the reasons for finding one report more persuasive than another. *State ex rel. Bell v. Indus. Comm.*, 72 Ohio St.3d 575 (1995). However, where the commission has set forth an explanation for rejecting medical evidence, the explanation must be reasonable and lawful. *State ex rel. Eberhardt v. Flxible Corp.*, 70 Ohio St.3d 649 (1994). The commission is prohibited from arbitrarily rejecting competent medical proof. *Id.*

{¶ 70} The SHO found:

> [M]uch of the evidence relied upon by the Injured Worker is from 2009 which is deemed stale and outside the regulatory requirements for reliance upon in the matter of permanent and total disability. Specifically, the report of Dr. Branca.

{¶ 71} Presumably, the "regulatory requirements" of which the SHO refers is found at Ohio Adm.Code 4121-3-34(C), which is captioned "Processing of applications for permanent total disability." Thereunder, Ohio Adm.Code 4121-3-34(C) provides:

(1) Each application for permanent total disability shall identify, if already on file, or be accompanied by medical evidence from a physician, or a psychologist or a psychiatric specialist in a claim that has been allowed for a psychiatric or psychological condition, that supports an application for permanent total disability compensation. The medical examination upon which the report is based must be performed within twenty-four months prior to the date of filing of the application for permanent total disability compensation. * * * If an application for permanent total disability compensation is filed that does not meet the filing requirements of this rule, or if proper medical evidence is not identified within the claim file, the application shall be dismissed without hearing. Where it is determined at the time the application for permanent total disability compensation is filed that the claim file contains the required medical evidence, the application for permanent total disability compensation shall be adjudicated on its merits as provided in this rule absent withdrawal of the application for permanent total disability compensation.

* * *

(4)

(a) The injured worker shall ensure that copies of medical records, information, and reports that the injured worker intends to introduce and rely on that are relevant to the adjudication of the application for permanent total disability compensation from physicians who treated or consulted the injured worker that may or may not have been previously filed in the workers' compensation claim files, are contained within the file at the time of filing an application for permanent total disability.

{¶ 72} The SHO's order strongly suggests that the July 2009 report of Dr. Branca and the September 5, 2012 joint report of Drs. Lake and Weintrab that relies upon Dr. Branca's report are stale (and therefore rejected) because Dr. Branca's report is premised upon her evaluation performed more than 24 months prior to the date of the filing of the PTD application.

{¶ 73} Rejection of those reports by applying the 24-month rule at Ohio Adm.Code 4121-3-34(C)(1), was an abuse of discretion.

{¶ 74} To begin, Ohio Adm.Code 4121-3-34(C)(1) sets forth a minimum threshold filing requirement to initiate the processing of a PTD application. Clearly, the September 5, 2012 joint report of Drs. Lake and Weintrab satisfies the regulatory filing requirement because relator was seen by Drs. Lake and Weintrab on September 5, 2012 and the PTD application was filed just eight days later on September 13, 2012.

{¶ 75} Ohio Adm.Code 4121-3-34(C)(1) is not a rule of evidence. By its own terms, the rule does not prohibit the PTD applicant from submitting other medical evidence predating by more than 24 months the filing of the PTD application as long as the threshold filing requirement is met.

{¶ 76} Moreover, Ohio Adm.Code 4121-3-34(C)(4) permits the injured worker to file "medical records, information, and reports that the injured worker intends to introduce and rely on that are relevant to the adjudication" of the PTD application. Unlike Ohio Adm.Code 4121-3-34(C)(1), Ohio Adm.Code 4121-3-34(C)(4)(a) sets no time limitation on the evidence the injured worker intends to introduce and rely upon as long as the evidence is "relevant."

{¶ 77} Clearly, the SHO misapplied Ohio Adm.Code 4121-3-34(C)(1)'s minimum threshold filing requirement to reject relevant medical evidence that the commission's rules permit relator to file and rely upon.

{¶ 78} Because the SHO also invoked staleness into her decision, *State ex rel. Hiles v. Netcare Corp.*, 76 Ohio St.3d 404 (1996), is instructive. The court states:

> A finding of evidentiary staleness should always be approached cautiously. More relevant than the time at which a report was rendered are the content of the report and the question at issue. For example, where the issue is maximum medical improvement, a report that finds a permanent impairment is rarely rendered invalid by the passage of time. Conversely, the changeable nature of a claimant's ability to work is often affected by time.

*Id.* at 407.

{¶ 79} Clearly, Dr. Branca's report was not stale as to the question of whether relator can be excused from the pursuit of vocational rehabilitation following his "significant attempt" to return to work in 2009. Relator's PTD application was filed some

three years after relator last worked. Dr. Branca's report addresses the advisability of vocational rehabilitation during that period.

{¶ 80} Dr. Branca recommended deferral of "vocational evaluation and assessment * * * until he has adequate pain management and adequate management of affective disturbance." That Dr. Branca herself did not address whether adequate pain management or adequate management of affective disturbance was achieved during the three-year period prior to the filing of the PTD application does not render her July 2009 report stale.

{¶ 81} In short, the SHO abused her discretion in finding Dr. Branca's report to be stale.

{¶ 82} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate the May 20, 2013 order of its SHO that denies relator's PTD application, and, in a manner consistent with this magistrate's decision, enter an order that adjudicates the PTD application.


/S/ MAGISTRATE
KENNETH W. MACKE


**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).