[Cite as *State ex rel. Reichley v. Indus. Comm.*, 2017-Ohio-2939.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel.<br>James R. Reichley, | : | |
| | : | |
| Relator, | : | |
| | : | |
| v. | : | No. 16AP-263 |
| | : | |
| Industrial Commission of Ohio<br>and Cooper Tire & Rubber Co., | | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on May 23, 2017

**On brief:** *Law Offices of Thomas Tootle*, and *Thomas Tootle*, for relator.

**On brief:** *Michael DeWine*, Attorney General, and *Shaun Omen,* for respondent Industrial Commission of Ohio.

**On brief:** *Eastman & Smith Ltd., Richard L. Johnson*, and *Lindsey K. Ohlman*, for respondent Cooper Tire & Rubber Company.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

DORRIAN, J.

{¶ 1} Relator, James R. Reichley, has filed an original action requesting a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate the February 19, 2013 order of its staff hearing officer ("SHO") that denied his first application for permanent total disability ("PTD") compensation ("February 2013 order") and the January 27, 2016 order of its SHO that denied his second application for PTD compensation ("January 2016 order"), and to enter an order that eliminates the finding

that relator voluntarily abandoned the workforce and adjudicates the merits of relator's PTD application.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate recommends this court deny the request for a writ of mandamus.

{¶ 3} Relator has filed the following two objections to the magistrate's decision:

> [I.] The record fails to contain "some evidence" to support a finding of voluntary abandonment of the work-force (and therefore precluding an award of permanent total disability). The Magistrate's conclusion of law finding otherwise was in error.
>
> [II.] Evidence demonstrating Relator's two week return-to-work was sufficient to establish a re-entry to the work-force. The Magistrate's conclusion of law finding otherwise was in error.

{¶ 4} The facts of this case, as set forth in the magistrate's decision, indicate that relator suffered a severe injury on March 4, 1988, while employed by respondent Cooper Tire & Rubber Company ("Cooper Tire"). Relator's claim was allowed for multiple conditions, including partial paraplegia. Despite these injuries, in June 1989, relator returned to work as a supervisor at Cooper Tire, and remained in that position until October 30, 2011. Relator's post-injury work history of more than 22 years certainly demonstrates his willingness to remain in the workforce. After leaving employment with Cooper Tire, relator filed a first application for PTD compensation on August 14, 2012. He subsequently filed a second application for PTD compensation on December 23, 2014.

{¶ 5} As explained in the magistrate's decision, the February 2013 order denied relator's first PTD application on alternative bases: (1) that relator voluntarily abandoned the workforce, and (2) that relator retained the ability to perform sustained remunerative employment. The latter conclusion was based on the reports of Drs. Donato Borrillo and Gerald Steinman, which constitute some evidence to support the SHO's finding. Similarly, the January 2016 order denied relator's second PTD application on alternative bases: (1) that relator voluntarily abandoned the workforce, and (2) that relator had not reached maximum medical improvement for all of the allowed conditions in his claim.

The latter conclusion was based on the reports of Drs. Franklin Kindl and Kurt Kuhlman, which constitute some evidence to support the SHO's finding.

{¶ 6} Relator's mandamus complaint and objections to the magistrate's decision only challenge the findings and conclusions with respect to voluntary abandonment of the workforce. Relator has not challenged the alternative basis for the February 2013 order or the January 2016 order. "If it can be said that relator has challenged only one of two bases [for denial of a PTD application], he cannot show entitlement to a writ of mandamus if the basis he has failed to challenge supports the commission's decision." *State ex rel. Terry v. Anderson's, Inc.*, 10th Dist. No. 13AP-652, 2014-Ohio-4169, ¶ 57. *See also State ex rel. Davis-Hodges v. Indus. Comm.*, 10th Dist. No. 10AP-183, 2010-Ohio-5871, ¶ 41 ("Where the commission provides an alternative rationale for its determination which withstands the scrutiny of mandamus review and provides an independent basis for the commission's decision, the fact that the commission incorrectly applied the law in a separate portion of the order does not constitute grounds for the granting of a writ of mandamus."). Accordingly, we need not reach the issue of voluntary abandonment; the alternative bases in each order support the commission's decision and relator has failed to challenge those conclusions.

{¶ 7} Upon review of the magistrate's decision, an independent review of the record, and due consideration of relator's objections, we find the magistrate has properly determined the pertinent facts. Moreover, we find that each order that relator seeks to have vacated contained an alternative basis for the commission's decision, and that relator has failed to challenge the alternative bases contained in those orders. Therefore, relator is not entitled to a writ of mandamus and we overrule relator's objections to the magistrate's decision. We adopt the magistrate's findings of fact as our own; because we need not reach the issue of voluntary abandonment of the workforce, we do not adopt the magistrate's conclusions of law. Accordingly, the requested writ of mandamus is hereby denied.

*Objections overruled;*
*writ of mandamus denied.*

TYACK, P.J., and LUPER SCHUSTER, J., concur.

———————

# APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. James R. Reichley, | : | |
| Relator, | : | |
| v. | : | No. 16AP-263 |
| Industrial Commission of Ohio and | : | (REGULAR CALENDAR) |
| Cooper Tire & Rubber, Co., | : | |
| Respondents. | : | |

---

### M A G I S T R A T E ' S   D E C I S I O N
NUNC PRO TUNC[1]
Rendered on December 30, 2016

---

*Law Offices of Thomas Tootle,* and *Thomas Tootle,* for relator.

*Michael DeWine,* Attorney General, and *Shaun Omen,* for respondent Industrial Commission of Ohio.

*Eastman & Smith Ltd., Richard L. Johnson,* and *Lindsey K. Ohlman,* for respondent Cooper Tire & Rubber, Co.

---

IN MANDAMUS

{¶ 8} In this original action, relator, James R. Reichley, requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission") to vacate the February 19, 2013 order of its staff hearing officer ("SHO") that denied his first application for permanent total disability ("PTD") compensation based on a finding that

---

[1] This magistrate's decision replaces, nunc pro tunc, the original magistrate's decision released December 29, 2016, and is effective as of that date. This magistrate's decision deletes the word "leaving" and replaces it with the words "returning to" in the first paragraph at page eight of the original magistrate's decision.

relator voluntarily abandoned the workforce, and to enter an order that eliminates the finding that relator voluntarily abandoned the workforce.

{¶ 9} Furthermore, relator requests that the writ order the commission to vacate the January 27, 2016 order of its SHO that denies his second application for PTD compensation based on a finding that he voluntarily abandoned the workforce, and to enter an order that eliminates the finding that he voluntarily abandoned the workforce and adjudicates the merits of the PTD application.

Findings of Fact:

{¶ 10} 1. On March 4, 1988, relator was severely injured while employed as a "Mobile Equipment Servicer" for respondent Cooper Tire & Rubber, Co. ("Cooper Tire"), a self-insured employer under Ohio's workers' compensation laws. On that date, while working on tread tray wheels, the tread tray rolled over onto relator's body pinning him to the floor.

{¶ 11} 2. The industrial claim (No. 968146-22) was initially allowed for:

> Burst fracture L3 with incomplete paraplegia; compound fracture right tibia and fibula; fracture of right calcaneus; laceration left forehead; ulcer of heel and midfoot; claw foot, acquired; left wrist scaphoid contusion.

{¶ 12} 3. Following some recovery from the injury, relator was able to ambulate with the use of bilateral leg braces and forearm crutches.

{¶ 13} 4. In June 1989, relator returned to work as a supervisor at Cooper Tire. He maintained his employment as a supervisor until he left his employment with Cooper Tire on October 30, 2011.

{¶ 14} 5. Relator applied for social security disability benefits. He began receiving the benefits in April 2012.

{¶ 15} 6. On March 29, 2012, attending physician Stephen J. Freshwater, M.D., wrote:

> James Reichley had a work related burst fracture of L3 in March 1988 which resulted in severe cauda equina compression and paraplegia. He has had increased pain in his buttocks and legs beginning in August last year. Narcotic pain medications were not effective for controlling his pain. He had a CT of the lumbar spine in September 2011 showing diffuse circumferential and internal dense calcifications of

the thecal sac between L3 and S2. His films were evaluated by Jason Schroeder, M.D. who did not believe there was any surgical procedure that could begin to help the changes present. He has been seeing Thomas Kindl, M.D. at Midwest Pain Treatment Center. He's had several different injections which have not made much difference with his pain. He is worse if he has to stand for more than a few minutes at a time, walk more that 50 feet, or sit for a prolonged period of time. Given this progression of his problem, I do not believe that he can return to work at Cooper Tire in his former capacity or in any available job with his current limitations. I believe that he qualifies for a total permanent disability.

{¶ 16} 7. On May 10, 2012, Thomas Kindl, M.D., relator's pain management physician, wrote:

[T]o a reasonable degree of medical certainty, I do not believe that Mr. Reichley is a candidate to return to work at his former employer in any reasonable capacity, given his functional and medical limitations. I believe that his condition is unlikely to change over the following 12-month period of thereafter. I believe he therefore qualifies for total permanent disability.

{¶ 17} 8. On August 14, 2012, relator filed his first PTD application. In support, relator submitted the March 29, 2012 report from Dr. Freshwater.

{¶ 18} 9. On the PTD application, relator indicated that he was currently receiving social security disability benefits which started in April 2012.

{¶ 19} 10. On October 3, 2012, at the request of Cooper Tire, relator was examined by neurologist Gerald S. Steiman, M.D. In his five-page narrative report dated October 7, 2012, Dr. Steiman opined:

Mr. Reichley's history, medical record review, and physical exam provide credible evidence he is now at the point where he is unable to perform his prior job activity without restrictions. Clearly, he is able to return to a sedentary job activity but I do not believe he would be able to perform three hours of walking and two hours of standing. A job activity should be one in which he sits most of the day with intermittent and occasional standing and short distance walking. For longer distances a cart would be necessary.

{¶ 20} 11. On November 6, 2012, at the commission's request, relator was examined by Donato J. Borrillo, M.D. In his seven-page narrative report dated November 8, 2012, Dr. Borrillo opined:

> Mr. Reichley is extremely motivated and admirably ambitious, having returned to work after a significant traumatic injury and having retired in 2011.
>
> Notwithstanding his retirement from the workforce, Mr. Reichley is capable of sedentary duty. His lumbar condition prevents [him] from lifting greater than this amount, and he requires ADA access for his Loftstrand crutch use and AFO use. Furthermore, because of his back injury and incomplete paraplegia, he is unable to bend, crawl, climb, walk on uneven surfaces, or kneel safely. He requires a sit or stand option.

{¶ 21} On a form captioned "Physical Strength Rating," Dr. Borrillo indicated by his mark that relator is capable of "sedentary work."

{¶ 22} Under "[f]urther limitations," in the space provided, Dr. Borrillo wrote in his own hand: "ADA access [with] crutch use."

{¶ 23} 12. At the request of Cooper Tire, Al Walker, a certified vocational evaluation specialist, prepared a document captioned "Vocational Assessment and Transferrable Skills Analysis Report."

{¶ 24} In his 16-page report dated January 14, 2013, Walker concluded:

> In summary, Mr. Reichley's demonstrated work history and his projected physical limitations, directly related to his allowed conditions of his workers' compensation claims, do allow for selective job placement. His work history has been skilled demonstrating his ability to learn and function adequately at higher levels of vocational competency. It is important to understand that this vocational evaluation can only show if an individual has sufficient residual physical and mental capacities to meet the demands of particular jobs. It is not possible to factor in motivation or the willingness of an individual to do what is necessary to overcome the barriers they face. Dr. Borrillo and Dr. Steiman both state that Mr. Reichley is capable of full time physical work activity. No psychological limitations were identified. Taking into consideration the medical examinations, transferable skills analysis and labor market analysis there are numerous jobs for which Mr. Reichley has demonstrated

the aptitudes and abilities, general educational development and physical capabilities to perform.

{¶ 25} 13. On February 19, 2013, an SHO heard relator's first PTD application. The hearing was recorded and transcribed for the record.

{¶ 26} 14. At the hearing, the following exchange occurred between the hearing officer and relator:

Q. There is no doubt it was a significant injury; after the injury you were able to go back to work and did work for a number of years?

A. I did.

Q. With Cooper, and you quit or left work what year?

A. Well, I --

Q. Left the work force entirely?
A. For the entirety, 2011.

Q. 2011, okay.

A. And the beginning of November of 2011 from severe back pain, and so I was off going to pain management. He gave me some injections, and then it seemed like I had to get more injections into the back trying to solve that problem. My leg pain had worsened.

Q. And that was Dr. Kindl?

A. Dr. Kindl. I was to the point of not being able to sleep. It used to be I could go to sleep and it wouldn't bother me, and now it wakes me up.

Q. Okay. You got social security disability?

A. Yes.

(Tr. at 4-5.)

{¶ 27} 15. At the hearing, the following exchange occurred between counsel for Cooper Tire and relator:

Q. Let me ask you, would you be willing to do vocational retraining?

A.  If he thinks, yeah, I guess, I could, but I guess I don't know whether that's going to gain anything, because by the time you go to vocational instructions or whatever, if they send you to college, aren't we talking two to four years, and by that time I am going to be 57, 58 years old, just about into the social security retirement.

Q.  But your response is that you would be willing to do vocational restraining [sic]?

A.  If that is what it takes, I guess, but I think with my age and the distance, I am not so sure, I am kind of on the fence, yes and no. I don't know whether I would benefit from it, and I feel like by going to school or going to do anything like that, you are not going to get much more years out of me. And you're right about retirement, yes, I have made up my mind to retire, and also made up my mind years ago that I was going to start collecting social security at 62 and not wait until 70, because my dad died at 70 and I decided I was not going to do that. So by being on the fence of what you are saying, I am not sure whether it would be a good thing or a bad thing.

(Tr. at 30.)

{¶ 28} 16. Following the February 19, 2013 hearing, the SHO issued an order denying the PTD application.  The SHO's order provides alternative bases for denial of the PTD application: (1) that relator voluntarily abandoned the workforce and is thus ineligible for PTD compensation, and (2) that relator retains the ability to perform sustained remunerative employment.  The SHO's order of February 19, 2013 explains:

There is a single claim in this application for permanent and total disability benefits. The injury occurred on 03/04/1988, at that time, the Injured Worker was employed as a mobile equipment servicer with the Employer of Record. At that time he was working on tread tray wheels and the tread tray rolled over the Injured Worker pinning him to the floor. He suffered a burst fracture at L3 with incomplete paraplegia. A compound fracture of the right tibia and fibula. A fracture of the right calcaneus. And a laceration of the left forehead. All of these conditions were certified by the Employer at the time of the original injury. Later, the Self-Insuring Employer certified ulcer of the heel and midfoot; claw foot, acquired and left wrist scaphoid contusion.

In spite of the significant injury, the Injured Worker was able to return to work with the Employer of Record in a different position, as a supervisor in June of 1989. He continued to work with the Employer of Record in this position until he left work on 10/30/2011. At that time, he took disability retirement.

Related to the allowed physical conditions within this claim, the Injured Worker was evaluated by an Industrial Commission Specialist, Donato Borrillo, M.D. Dr. Borrillo examined the Injured Worker on 11/06/2012, and in a report of 11/08/2012 Dr. Borrillo opined that Mr. Reichley is capable of working at sedentary duty. Dr. Borrillo also opined that the allowed conditions were at maximum medical improvement.

The Injured Worker was also evaluated by a physician of the Employer's choice. On 10/07/2012 Gerald Steiman, M.D., evaluated the Injured Worker on behalf of the Employer. Dr. Steiman offered no significant opinion regarding maximum medical improvement for the allowed physical conditions. However, Dr. Steiman did opine that Mr. Reichley is capable of performing sedentary work duties but would be unable to return to his position of employment as a supervisor, that he has been performing for the last twenty-three years, secondary to the need to stand for two hours and walk for three hours as part of the job duties.

This Staff Hearing Officer finds Dr. Borrillo to be persuasive that the Injured Worker is, in fact, [at] maximum medical improvement for the allowed physical conditions within this claim.

Further, this Staff Hearing Officer finds the reports of Drs. Borrillo and Steiman to be persuasive that the residual impairments secondary to the allowed conditions within this claim prevent Mr. Reichley from returning to his prior position of employment and from returning to work at his secondary position of employment as a supervisor. The reports of Drs. Borrillo and Steiman are found to be persuasive that the residual actions limit Mr. Reichley to a sedentary work position limiting him to exerting up to ten pounds of force occasionally and negligible amounts of force frequently. The physicians are found persuasive that Mr. Reichley would be capable of sedentary work which involves sitting most of the time but may involve walking or standing for brief periods of time.

This Staff Hearing Officer finds that Mr. Reichley does retain the physical capacity for sedentary work.

The issue of Mr. Reichley's retirement was raised.

* * *

Mr. Reichley's retirement was, at least in part, disability related. He was able to obtain Social Security Disability Benefits. However, at hearing Mr. Reichley did testify that he was planning on retiring at age sixty-two. He went on to indicate he had no interest in returning to the workforce and when question[ed] about vocational rehabilitation he was equivocal as he was not planning on working past age sixty-two.

Mr. Reichley is currently fifty-five years of age and was fifty-four at the time he left the workforce. His age at worst, is a neutral factor. In fact, it could be viewed as a positive factor as he could, potentially, spend ten years, or more, in the workforce should he choose. Mr. Reichley can read, write and do basic math. He has a High School diploma. As such, he has the basic tools for entering the workforce at an entry level. Further, he has a long work history with the Employer of Record which is a positive factor, as Employer's value long-term Employees. He also has supervisory skills which are a positive factor. A vocational rehabilitation evaluation was performed by Al Walker, M.S. CVE-R, ABVE/AE on 01/15/2013. Mr. Walker, based upon the reports of Drs. Borrillo and Steiman, indicated with a transferable skills analysis and a labor market analysis there were numerous jobs Mr. Reichley was potentially able to perform. Specifically, Mr. Walker listed at least thirty jobs in the sedentary work category ranging from skilled, to semi skilled, to unskilled for which Mr. Reichley is qualified to perform at the entry level.

Mr. Reichley left his prior position of employment based upon allowed condition impairments. This finding is supported by the Employer examination performed by Dr. Steiman. However, the testimony of Mr. Reichley gives rise to the question of whether Mr. Reichley chose to not return to the workforce at a different level of employment.

* * *

This Staff Hearing Officer finds the testimony of Mr. Reichley clearly indicated that he left the workforce in 2011 without any intent to return to the workforce in a lesser, sedentary capacity. This Staff Hearing Officer finds Mr. Reichley abandoned the workforce and not merely the previous job.

This Staff Hearing Officer finds that Mr. Reichley has the basic tools and knowledge set for a return to work at entry level sedentary work at a clerical level.

This Staff Hearing Officer finds no vocational preclusion to re-training or skills enhancement to increase Mr. Reichley's vocational potential. The Ohio Courts have indicated that the Industrial Commission may consider a failure of the Injured Worker to undertake rehabilitation or training that would permit a return to work. The relevant vocational inquiry is "whether the claimant may return to the job market by using past employment skills or those skills which may be reasonably developed." State ex rel. Speelman v. Industrial Comm., (1992) 73 Ohio App.3d 757, 762. In State ex rel. Bowling v. National Can Corp. (1996), 77 Ohio St.3d 148, the Ohio Supreme Court indicated that an injured worker must be held to a standard of accountability to both the Industrial Commission and the courts, when despite the opportunity for further education or advancement of skills, the Injured Worker has not done so. Mr. Reichley, when he found he could no longer perform his supervisory position, retired and did not pursue further educational or skills enhancement.

This Staff Hearing Officer finds pursuant to the Ohio Supreme Court case law, particularly within State ex rel. Wilson v. Indus. Comm. (1997), 80 Ohio St.3d 250, permanent total disability compensation is compensation of last resort, to be awarded only when all reasonable avenues of accomplishing a return to sustained remunerative employment have failed. Thus it is not unreasonable to expect an Injured Worker to participate in return to work efforts to the best of his or her ability, or to take the initiative to improve re-employment potential.

For the above reasons, the application for permanent and total disability filed 08/14/2012 is denied.

{¶ 29} 17. On April 12, 2013, the three-member commission mailed an order denying relator's request for reconsideration.

{¶ 30} 18. On December 7, 2014, Dr. Freshwater wrote:

James Reichley had an industrial accident in March 1988 involving a burst fracture of L3 which resulted in severe cauda equina compression and paraplegia. Due to increasing pain beginning about August 2011, total permanent disability was recommended. * * *

Due to continued pressure from his employer and a sense of despair/worthlessness related to not working, Mr. Reichley consented to return to a clerical job with his employer in October 2014. He states that his job duties were primarily sitting at a desk and performing data entry. Within two weeks, he discovered that he could not tolerated [sic] the pain across his low back radiating into his legs which was worsened by sitting even for short periods of time. He notes that he cannot walk very far because of back pain nor can he stand for any length of time due to back pain and the leg braces. Since the two-week trial, he has not worked.

There is no amount of pain medication, therapy, or surgery which will alleviate his pain and allow him to do a sitting, standing or walking job. As stated previously, it is my opinion that he is totally and permanently disabled.

{¶ 31} 19. On December 9, 2014, Dr. Kindl wrote:

Mr. James Reichley has been evaluated and treated by the undersigned pursuant to back and leg condition. As you recall, he suffered an L3 burst fracture with resultant paraplegia.

Despite near complete loss of leg use he has remained active with respect to remunerative labor. His physical limitations have precipitated the need for the use of bilateral one point [walking] devices to maintain [mobility].

The protracted use of the bilateral one point walking devices has precipitated compensatory shoulder discomfort which is likely a sequela of the repetitive misuse accelerating degenerative change as a result of carrying near total body weight on the upper extremities. The likelihood of osseous and soft tissue derangement is high.

In summary, Mr. Reichley presents with near complete paralysis of his legs after an L3 burst fracture. He has been reliant on upper extremity weight bearing for years which

has caused progressive shoulder deterioration. He is no longer able to support his body weight on two canes.

I therefore indicate that to a reasonable degree of medical certainty Mr. Reichley does present with substantial physical barriers to performing remunerative labor. This condition is permanent to a greater than 50% degree of certainty. Improvement is not expected.

{¶ 32} 20. On December 23, 2014, relator filed his second PTD application. In support, relator submitted the December 7, 2014 report of Dr. Freshwater and the December 9, 2014 report of Dr. Kindl.

{¶ 33} 21. Also, relator submitted wage statements from R & R Chinchilla, Inc. showing that he was employed from September 28, 2014 through October 25, 2014.

{¶ 34} Relator was paid biweekly at $10 per hour. During the first biweekly period, relator worked 40 hours and received gross pay of $400. During the second biweekly period, relator worked 35 hours and received gross pay of $350.

## Additional Claim Allowances

{¶ 35} 22. Earlier, on May 10, 2013, relator moved for additional allowances in the claim.

{¶ 36} 23. Following a July 26, 2013 hearing, a district hearing officer ("DHO") issued an order additionally allowing the claim for "bilateral supraspinatus tendon tear; bilateral shoulder impingement syndrome."

{¶ 37} 24. Cooper Tire administratively appealed the DHO's order of July 26, 2013.

{¶ 38} 25. Following a September 6, 2013 hearing, an SHO issued an order additionally allowing the claim for "bilateral supraspinatus tendon tear; bilateral shoulder impingement syndrome."

{¶ 39} 26. On October 4, 2013, another SHO mailed an order refusing the employer's appeal from the SHO's order of September 6, 2013.

{¶ 40} 27. On January 5, 2015, relator moved for an additional claim allowance—"bicipital tenosynovitis left."

{¶ 41} 28. On January 9, 2015, an SHO issued an "Ex Parte Order," stating:

Injured Worker's IC-2 Application for Permanent Total Disability, filed 12/23/2014, is continued because the

> Injured Worker's C-86 motion requesting an additional allowance, filed 01/05/2015 and received 12/22/2014 by Self-Insured Employer, must be processed prior to consideration of the Injured Worker's IC-2, pursuant to Ohio Adm.Code 4121-3-34.
>
> The Injured Worker's C-86 motion requesting an additional allowance, filed 01/05/2015, is referred for processing. Thereafter, the IC-2 should be referred to the Industrial Commission for adjudication.

{¶ 42} 29. Following a February 17, 2015 hearing, a DHO issued an order additionally allowing the claim for "bicipital tenosynovitis, left."

{¶ 43} 30. The employer administratively appealed the DHO's order of February 17, 2015.

{¶ 44} 31. Following a May 11, 2015 hearing, an SHO issued an order stating that the DHO's order of February 17, 2015 is "modified." However, the May 11, 2015 order of the SHO additionally allowed the claim for "bicipital tenosynovitis left."

{¶ 45} 32. On June 10, 2015, another SHO mailed an order refusing the employer's appeal from the SHO's order of May 11, 2015.

{¶ 46} 33. Earlier, on December 3, 2014, relator underwent left shoulder surgery that was performed by orthopaedic surgeon Michael R. Tremains, M.D.

{¶ 47} Dr. Tremains performed an arthroscopic rotator cuff repair, a subacromial decompression, an arthroscopic Mumford procedure, and a biceps tenotomy.

{¶ 48} 34. On February 4, 2015, at the request of Cooper Tire, relator was examined by Douglas C. Gula, D.O. Dr. Gula examined only for the allowed conditions related to the left shoulder.

{¶ 49} 35. On August 10, 2015, Dr. Gula issued an addendum to his February 4, 2015 report. In his addendum, Dr. Gula opined:

> In my medical opinion, Mr. Reichley is capable of performing work in the sedentary category when considering my examination of the left shoulder that was performed on February 4, 2015.

{¶ 50} 36. On August 26, 2015, at the commission's request, relator was examined by Kurt A. Kuhlman, D.O. In his five-page narrative report, Dr. Kuhlman listed the allowed conditions of the claim:

Burst fracture L3 with incomplete paraplegia; compound fracture right tibia and fibula; fracture of right calcaneus; laceration left forehead; ulcer of heel and midfoot; claw foot, acquired; left wrist scaphoid contusion; bilateral supraspinatus tendon tear; bilateral shoulder impingement syndrome; bicipital tenosynovitis, left.

{¶ 51} Page five of Dr. Kuhlman's report states:

**ANSWER TO QUESTIONS:** After performing a thorough history and physical examination, as well as review of multiple medical records, I can answer the following questions with a reasonable degree of medical certainty and probability.

[One] *Has the Injured worker reached maximum medical improvement with regard to each specified allowed condition? Briefly describe the rationale for your opinion. If yes, then please continue to items #2 and #3.*

a. **Regarding burst fracture L3 with incomplete paraplegia, compound fracture right tibia and fibula, fracture right calcaneus, laceration left forehead, ulceration of heel and midfoot, clawfoot acquired, left wrist scaphoid contusion, left supraspinatus tendon tear, left shoulder impingement syndrome, bicipital tenosynovitis left,** the patient has reached maximum medical improvement. He has underwent extensive work up and treatment including multiple surgeries. His symptoms are not changing significantly at this time with respect to these allowed conditions. Therefore, he has reached maximum medical improvement.

b. **Regarding right supraspinatus tendon tear, right shoulder impingement syndrome,** he has not reached maximum medical improvement. This is because he is scheduled for surgery on the right shoulder in November 2015. After his left shoulder surgery in December 2014, he did make definite improvement. Therefore, I am optimistic his right shoulder will improve after surgery as well. Therefore, he has not reached maximum medical improvement with respect to these allowed conditions.

[Two] *Based on the AMA Guides, 5th Edition, and with reference to the Industrial Commission Medical Examination Manual, provide the estimated percentage of*

> *whole person impairment arising from each allowed condition. Please list each condition and whole person impairment separately, and then provide a combined whole person impairment. If there is no impairment for an allowed condition, indicate 0 percent.* Following the Industrial Commission guidelines, I was instructed not to answer this question because he has not reached maximum medical improvement for all of the allowed conditions of this claim. I would consider reevaluating this claim six months after his scheduled right shoulder surgery in November 2015 as he will probably be maximally medically improved at that time.
>
> [Three] *Complete the enclosed physical strength rating. In your narrative report provide a discussion setting forth physical limitations resulting from the allowed conditions.* Following the Industrial Commission guidelines, I was instructed not to answer this question because he has not reached maximum medical improvement for all of the allowed conditions of this claim.

(Emphasis sic.)

{¶ 52} 37. On December 9, 2015, relator underwent right shoulder surgery performed by Dr. Tremains. Dr. Tremains performed a right shoulder arthroscopic rotator cuff repair, an arthroscopic subacromial decompression, an arthroscopic Mumford procedure, and an arthroscopic biceps tenotomy.

{¶ 53} 38. On January 27, 2016, relator's second PTD application was heard by an SHO. The hearing was recorded and transcribed for the record. On February 10, 2016, the SHO mailed an order denying relator's second PTD application. The SHO's order of January 27, 2016 explains:

> First and foremost, this Hearing Officer finds the Injured Worker voluntarily abandoned the entire job market. This Hearing Officer finds the Injured Worker filed a prior 08/14/2012 application for permanent total disability which was addressed by a Staff Hearing Officer order issued 02/27/2013. The Staff Hearing Officer found the Injured Worker to have voluntarily removed himself from the work force. It was found that the Injured Worker had worked for the Employer of record, as a supervisor, until he left his employment on 10/30/2011, at which time, he took disability retirement. The testimony of the Injured Worker was memorialized by the prior Staff Hearing Officer order

indicating the Injured Worker testified that he was planning on retiring at the age of 62, had no interest in returning to the work force, and when he was questioned about vocational rehabilitation he was equivocal as he was not planning on working past the age of 62. This Hearing Officer finds it notable that the Injured Worker's current application for permanent total disability, filed 12/23/2014, indicates he is not interested in rehabilitation services and does not desire to undergo a rehabilitation evaluation. From the Injured Worker's testimony and application for permanent temporary disability, this Hearing Officer finds the Injured Worker worked two weeks, doing data entry, for a business named R & R Chinchilla during the period 10/06/2014 to 10/21/2014. He testified that he left this employment due to having a progression of low back pain with neurological pain radiating to his hips and legs. However, this Hearing Officer finds the claim file does not contain any contemporaneous medical documentation indicating Injured Worker was removed from and/or disabled from doing this work.

This Hearing Officer finds the Injured Worker's two week return to employment in October of 2014 did not cure his voluntary abandonment of the work force so as to establish his eligibility for temporary total disability compensation or permanent total disability compensation. The Supreme Court of Ohio in *State ex rel. McCoy v. Dedicated Transport, Inc.,* 97 Ohio St.3d 25, 2002-Ohio-5305 held that an Injured Worker who abandons his or her former position of employment will be eligible to receive temporary total disability compensation if he or she re-enters the work force and, due to the original industrial injury, becomes temporarily and totally disabled while working at his or her new job. This Hearing Officer finds no evidence that the Injured Worker became temporarily and totally disabled while working for R & R Chinchilla in October of 2014, including any request for payment of temporary total disability compensation contemporaneous to leaving this position. Thus, this hearing Officer finds the Injured Worker did not cure his voluntary abandonment so as to establish his eligibility for permanent total disability should he be found to be permanently and totally disabled subsequent to October of 2014.

In addition, the Injured Worker's application for permanent total disability is denied for the reason that this Hearing Officer does not find the Injured Worker to have reached maximum medical improvement for all of the allowed

conditions in this claim. This Hearing Officer finds in support of the Injured Worker's application for permanent total disability, the Injured Worker submitted a 12/09/2014 report of Franklin Kindl, M.D. wherein he opined the Injured Worker to present with near complete paralysis of his legs after an L3 burst fracture for which he is relying on upper extremity weight bearing for years which has caused progressive shoulder deterioration. He indicated the Injured Worker is no longer able to support his body weight onto canes. He opined the Injured Worker to have substantial physical barriers to performing remunerative labor and his condition is permanent. This Hearing Officer finds the Injured Worker recently had right shoulder arthroscopic rotator cuff repair with subacromial decompression, Mumford procedure, biceps tenotomy and debridement of the subscapularis and labral rim. At hearing, the Injured Worker acknowledged that once he healed up from his shoulder surgeries, the goal was for him to be able to use crutches again.

On 08/26/2015, an independent medical examination was conducted on behalf of the Industrial Commission by Kurt Kuhlman, D.O. He acknowledged that the Injured Worker was scheduled for right shoulder surgery, believed to be in November of 2015. Dr. Kuhlman indicated that he was optimistic that the Injured Worker's right shoulder would improve after surgery as well. Dr. Kuhlman concluded that the Injured Worker had not reached maximum medical improvement with respect to his right supraspinatus tendon tear and right shoulder impingement syndrome. This Hearing Officer finds no medical evidence that the Injured Worker has reached maximum medical improvement for the allowed right shoulder conditions. Lastly, this Hearing Officer does not find a persuasive opinion from any physician supporting the Injured Worker to be permanently and totally disabled as a result of any of the recognized physical conditions which do not pertain to the right shoulder.

Based on the aforementioned findings, this Hearing Officer does not find sufficient medical evidence that the Injured Worker is permanently and totally disabled, and if the medical evidence had established that the Injured Worker was permanently and totally disabled, this Hearing Officer does not find the Injured Worker eligible for permanent total disability benefits based on the finding that he has voluntarily abandoned the work force. Therefore, the Injured

Worker's application for permanent total disability, filed 12/23/2014, is denied.

{¶ 54} 39. On April 7, 2016, relator, James R. Reichley, filed this mandamus action.

Conclusions of Law:

{¶ 55} Two issues are presented: (1) whether the SHO's order of February 19, 2013 contains an abuse of discretion in finding that relator voluntarily abandoned the workforce at the time he left work at Cooper Tire on October 30, 2011; and (2) whether the finding of workforce abandonment in the SHO's order of January 27, 2016 constitutes an abuse of discretion by failing to find that relator re-established PTD eligibility by working at R & R Chinchilla, Inc. for a four-week period during September and October 2014.

**Basic Law—PTD—Workforce Abandonment**

{¶ 56} Ohio Adm.Code 4121-3-34 provides the commission's rules for the adjudication of PTD applications.

{¶ 57} Thereunder, Ohio Adm.Code 4121-3-34(D) provides guidelines for the adjudication of PTD applications.

{¶ 58} Ohio Adm.Code 4121-3-34(D)(1) (d) currently provides:

> If, after hearing, the adjudicator finds that the injured worker voluntarily removed himself or herself from the work force, the injured worker shall be found not to be permanently and totally disabled. If evidence of voluntary removal or retirement is brought into issue, the adjudicator shall consider evidence that is submitted of the injured worker's medical condition at or near the time of removal/retirement.

{¶ 59} Paragraphs two and three of the syllabus of *State ex rel. Baker Material Handling Corp. v. Indus. Comm.,* 69 Ohio St.3d 202 (1994) state:

> An employee who retires prior to becoming permanently and totally disabled is precluded from eligibility for permanent total disability compensation only if the retirement is voluntary and constitutes an abandonment of the entire job market. * * *
>
> An employee who retires subsequent to becoming permanently and totally disabled is not precluded from

eligibility for permanent total disability compensation regardless of the nature or extent of the retirement.

{¶ 60} Two cases involving PTD are instructive.

{¶ 61} In *State ex rel. Black v. Indus. Comm.,* 137 Ohio St.3d 75, 2013-Ohio-4550, the claimant, Billy G. Black, applied for PTD compensation following an industrial injury. The commission's denial of PTD compensation prompted Black to file a mandamus action in this court. Ultimately, on appeal, the Supreme Court of Ohio upheld the commission's denial of the application.

{¶ 62} Black was employed as a press operator for Park Ohio, a self-insured employer, when he injured his lower back on October 7, 2000. Dr. Elizabeth Mease diagnosed lumbar strain and placed Black on modified duty with restrictions. When he returned to work two days later, he was assigned to clean bathrooms. After a few hours, he returned to Dr. Mease who indicated that Black should not engage in any activity.

{¶ 63} On November 10, 2000, Dr. Mease authorized Black to return to work with restrictions and referred him to Dr. Mark Panigutti, an orthopedic physician.

{¶ 64} On December 11, 2000, Dr. Panigutti authorized Black to return to work on December 13, 2000 with weight and standing restrictions for one month, and after one month, to return to full duty.

{¶ 65} Also, on December 11, 2000, Black notified his employer that he intended to retire on February 28, 2001.

{¶ 66} Black returned to work on modified duty on December 13, 2000. On January 22, 2001, Black saw Dr. Panigutti for back pain and a possible hernia. Dr. Panigutti increased Black's weight restrictions based in part on complaints of pain unrelated to his back injury.

{¶ 67} The court, in *Black*, states:

> Black worked until February 9, 2001. He retired on February 28, 2001, at the age of 55 with 38 years of service. At no time following his retirement did Black pursue vocational training or seek other employment. In September 2001, he began receiving Social Security disability benefits. The record does not contain an explanation of the reasons for granting these benefits, but Black testified in 2009 that they may have included, in part, his lack of education and medical conditions not related to his industrial injury.

On August 14, 2009, Black applied for permanent-total-disability compensation. Following a hearing on July 1, 2010, a hearing officer denied his application. The hearing officer noted that there was no medical evidence that any physician had advised Black to retire because of his previously allowed injuries and that Black had not worked or looked for work since his retirement on February 28, 2001. Thus, the hearing officer concluded that Black's retirement was both voluntary and an abandonment of the entire workforce, making him ineligible for subsequent permanent-total-disability compensation.

*Id.* at ¶ 7-8.

{¶ 68} In its opinion, the court, in *Black,* sets forth basic law instructive on the issue before the court:

A claimant's eligibility for permanent-total-disability compensation may be affected if the claimant has voluntarily retired or abandoned the job market for reasons not related to the industrial injury. *State ex rel. McAtee v. Indus. Comm.*, 76 Ohio St.3d 648, 1996 Ohio 297, 670 N.E.2d 234 (1996); *State ex rel. Rockwell Internal. v. Indus. Comm.*, 40 Ohio St.3d 44, 531 N.E.2d 678 (1988). Thus, the character of the employee's retirement—whether voluntary or involuntary—is critical to the commission's analysis of a claimant's right to permanent-total-disability compensation. *State ex rel. Cinergy Corp./Duke Energy v. Heber*, 130 Ohio St.3d 194, 2011-Ohio-5027, 957 N.E.2d 1, ¶ 5.

* * *

Whether a claimant has voluntarily retired or has abandoned the workforce is a question of fact for the commission to determine. *State ex rel. Pierron v. Indus. Comm.*, 120 Ohio St.3d 40, 2008-Ohio-5245, 896 N.E.2d 140, ¶ 10. This court has described the question of abandonment as "'primarily * * * [one] of intent * * * [that] may be inferred from words spoken, acts done, and other objective facts.'" *State ex rel. Diversitech Gen. Plastic Film Div. v. Indus. Comm.*, 45 Ohio St.3d 381, 383, 544 N.E.2d 677 (1989), quoting *State v. Freeman,* 64 Ohio St.2d 291, 297, 414 N.E.2d 1044 (1980). Accordingly, the commission must consider all relevant circumstances, including evidence of the claimant's medical condition at or near the time of departure from the workforce, if submitted, and any other evidence that would

substantiate a connection between the injury and retirement. Ohio Adm.Code 4121-3-34(D)(1)(d); *Cinergy Corp.*, 130 Ohio St.3d 194, 2011-Ohio-5027, 957 N.E.2d 1, ¶ 7.

The commission is exclusively responsible for evaluating the weight and credibility of the evidence. *State ex rel. Burley v. Coil Packing, Inc.*, 31 Ohio St.3d 18, 20-21, 31 Ohio B. 70, 508 N.E.2d 936 (1987). If the commission's order is supported by some evidence in the record, then the commission has not abused its discretion and mandamus is not appropriate. *Id.* at 21.

*Id.* at ¶ 14, 18-19.

{¶ 69} The court, in *Black,* concluded:

Because the record contained some evidence to support the commission's decision that Black's retirement was voluntary and not injury-induced, we hold that the commission did not abuse its discretion when it determined that Black was ineligible for permanent total-disability compensation. Consequently, we reverse the judgment of the court of appeals and deny the writ.

*Id.* at ¶ 23.

{¶ 70} In *State ex rel. Kelsey Hayes Co. v. Grashel,* 138 Ohio St.3d 297, 2013-Ohio-4959, the claimant, Arthur Grashel applied for and obtained PTD compensation. Grashel's employer, Kelsey Hayes Company, filed an original action in this court in which it contended that Grashel had voluntarily abandoned the workforce and was thus ineligible for PTD compensation.

{¶ 71} This court granted the writ ordering the commission to rehear the matter and to consider whether Grashel had voluntarily abandoned the workforce when he retired in 2004. *Id.* at ¶ 10.

{¶ 72} Following a September 1, 2009 hearing, a commission SHO again awarded PTD compensation. *Id.* at ¶ 11.

{¶ 73} The hearing officer concluded that Grashel had left the workforce due to the allowed conditions in his claim.

{¶ 74} Kelsey Hayes filed another mandamus in this court. This court denied the writ and Kelsey Hayes appealed as of right to the Supreme Court of Ohio.

{¶ 75} In reversing the judgment of this court and granting the writ, the court, in *Kelsey Hayes* explained:

> Kelsey Hayes further maintains that not only did Grashel voluntarily retire in 2004 but he also failed to seek other employment or vocational training, thereby abandoning the entire job market and making himself ineligible for compensation for permanent total disability. *State ex rel. Baker Material Handling Corp*, 69 Ohio St.3d 202, 1994 Ohio 437, 631 N.E.2d 138, paragraph two of the syllabus.
>
> We agree that the evidence clearly demonstrates that Grashel had abandoned the entire job market. After he stopped working in September 2004, there is no evidence that he sought other employment. He did not attempt vocational rehabilitation despite statements from his treating physician indicating that he could return to work in an environment away from the fumes that had aggravated his condition. In October 2005, Grashel testified before the commission that he had opted to take an early social security retirement for financial reasons after his claim for temporary-total-disability compensation was denied in 2005.

*Id.* at ¶ 18-19.

### Basic Law—TTD—Workforce Abandonment

{¶ 76} *State ex rel. Pierron v. Indus. Comm.,* 120 Ohio St.3d 40, 2008-Ohio-5245 is the seminal case regarding denial of TTD eligibility based on voluntary workforce abandonment where the claimant failed to look for work following an involuntary job abandonment.

{¶ 77} Because *Pierron* is at the core of Cooper Tire's position in this action, a review of that case is instructive.

{¶ 78} In *Pierron*, the claimant, Richard Pierron, was seriously injured in 1973 while working as a telephone lineman for Sprint/United Telephone Company ("Sprint/United").

{¶ 79} After Pierron's injury, his doctor imposed medical restrictions that were incompatible with his former position of employment as a lineman. Sprint/United offered Pierron a light-duty job consistent with those restrictions and Pierron continued to work in that position for the next 23 years.

{¶ 80} In 1997, Sprint/United informed Pierron that his light-duty position was being eliminated.  Sprint/United did not offer Pierron an alternative position, but did give him the option to retire or be laid off. Pierron chose retirement.

{¶ 81} In the years that followed, Pierron remained unemployed except for a brief part-time stint as a flower delivery person.  In later 2003, he moved for TTD compensation beginning June 17, 2001.

{¶ 82} Ultimately, the three-member commission determined that Pierron had voluntarily abandoned the workforce when he retired in 1997.  Pierron then filed a mandamus action in this court.  This court denied the writ and Pierron appealed as of right to the Supreme Court of Ohio.

{¶ 83} In affirming the judgment of this court and, thus, upholding denial of the writ, the *Pierron* court explained:

> We are confronted with this situation in the case before us. The commission found that after Pierron's separation from Sprint/United, his actions—or more accurately inaction—in the months and years that followed evinced an intent to leave the work force. This determination was within the commission's discretion. Abandonment of employment is largely a question "'of intent * * * [that] may be inferred from words spoken, acts done, and other objective facts.'" *State ex rel. Diversitech Gen. Plastic Film Div. v. Indus. Comm.* (1989), 45 Ohio St.3d 381, 383, 544 N.E.2d 677, quoting *State v. Freeman* (1980), 64 Ohio St.2d 291, 297, 18 O.O.3d 472, 414 N.E.2d 1044. In this case, the lack of evidence of a search for employment in the years following Pierron's departure from Sprint/United supports the commission's decision.
>
> We recognize that Pierron did not initiate his departure from Sprint/United. We also recognize, however, that there was no causal relationship between his industrial injury and either his departure from Sprint/United or his voluntary decision to no longer be actively employed. When a departure from the entire work force is not motivated by injury, we presume it to be a lifestyle choice, and as we stated in *State ex rel. Pepsi—Cola Bottling Co. v. Morse* (1995), 72 Ohio St.3d 210, 216, 1995 Ohio 82, 648 N.E.2d 827, workers' compensation benefits were never intended to subsidize lost or diminished earnings attributable to lifestyle decisions. In this case, the injured worker did not choose to leave his employer in 1997, but once that separation nevertheless

occurred, Pierron had a choice: seek other employment or work no further. Pierron chose the latter. He cannot, therefore, credibly allege that his lack of income from 2001 and beyond is due to industrial injury. Accordingly, he is ineligible for temporary total disability compensation.

*Id.* at ¶ 10-11.

{¶ 84} Here, Cooper Tire relies heavily on *State ex rel. Floyd v. Formica Corp.,* 140 Ohio St.3d 260, 2014-Ohio-3614, a case that relies on *Pierron.*

{¶ 85} In the *Floyd* case under "Facts," the Supreme Court of Ohio states:

On March 11, 2000, Darwin Floyd was injured while working for the Formica Corporation, a self-insured employer. A workers' compensation claim was allowed for various shoulder conditions. Following surgery on his left shoulder, he returned to light-duty work in September 2000, until his light-duty assignment ended on January 21, 2001. At that time, Formica no longer had any position to accommodate Floyd's medical restrictions, so he began receiving temporary-total-disability compensation. Shortly afterward, Floyd, at age 63, applied for and began receiving Social Security retirement benefits, effective April 2001.

Floyd's temporary-total-disability compensation continued until June 21, 2006, when the commission determined that his condition had reached maximum medical improvement and terminated his compensation. A year later, he applied for permanent-total-disability benefits but withdrew his application. Following additional surgery on July 18, 2008, Floyd began receiving temporary-total-disability compensation until the commission concluded that his condition had again reached maximum medical improvement on May 26, 2009.

Floyd's current request for temporary-total-disability compensation followed surgery on November 26, 2010. A staff hearing officer denied his request, finding that Floyd was ineligible because he was not in the workforce as of November 26, 2010. The order stated:

The Staff Hearing Officer notes that in 2001, the Injured Worker was working for the Employer on a light duty basis when the Self-Insuring Employer informed the Injured Worker they no longer had light duty work available for him. The Staff Hearing Officer finds that the Injured Worker was placed on temporary total disability and later was found to

have reached maximum medical improvement for the recognized conditions in the claim. The Injured Worker testified that he had not worked anywhere since he had stopped working in 2001 when there was no light duty work available. He applied for and began receiving social security retirement benefits in May, 2001. Although the Injured Worker testified at the hearing he would have kept working for the Employer if light duty work had remained available, he acknowledged he did not attempt to return to work anywhere else after 2001.

The hearing officer found that there was no evidence that Floyd had tried to find any employment since 2001. According to the hearing officer, who cited *State ex rel. Pierron v. Indus. Comm.*, 120 Ohio St.3d 40, 2008-Ohio-5245, Floyd's failure to look for any other employment was evidence that he did not intend to re-enter the workforce after leaving Formica, thus making him ineligible for further compensation. The commission agreed.

*Id.* at ¶ 4-7.

{¶ 86} In upholding the commission's decision that denied the request for TTD compensation, the court explained:

An injured worker's eligibility for temporary-total-disability compensation depends not only on whether the claimant is unable to perform the duties of the position of employment, but also on whether the claimant continues to be a part of the active workforce. *Baker* at 380. Because temporary-total-disability compensation is intended to compensate an injured worker for the loss of earnings while the industrial injury heals, a claimant who is no longer part of the workforce can have no lost earnings. *Pierron*, 120 Ohio St.3d 40, 2008-Ohio-5245, 896 N.E.2d 140, ¶ 9; *State ex rel. Ashcraft v. Industrial Com. of Ohio*, 34 Ohio St.3d 42, 43-44, 517 N.E.2d 533 (1987).

A claimant who voluntarily retires for reasons unrelated to the industrial injury may no longer be eligible for temporary-total-disability compensation to which he otherwise might be entitled if, by retiring, he has voluntarily removed himself permanently from the workforce. *Baker* at 383. Moreover, if the departure is related to the industrial injury, "it is not necessary for the claimant to first obtain other employment, but it is necessary that the claimant has not foreclosed that possibility by abandoning the entire workforce" in order to

remain eligible for temporary-total-disability compensation. *State ex rel. Lackey v. Indus. Comm.*, 129 Ohio St.3d 119, 2011-Ohio-3089, 950 N.E.2d 542, ¶ 11; Baker at 383-384.

Thus, the critical issue for postretirement eligibility for temporary-total-disability compensation is whether the injured worker permanently abandoned the entire job market after retirement. This is a factual question for the commission that depends primarily on what the claimant intended. *State ex rel. Diversitech General Plastic Film Div. v. Industrial Com. of Ohio*, 45 Ohio St.3d 381, 383, 544 N.E.2d 677 (1989). The commission may infer a claimant's intent """from words spoken, acts done, and other objective facts.""" *Id.*, quoting *State v. Freeman*, 64 Ohio St.2d 291, 297, 414 N.E.2d 1044 (1980), quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir.1973). The commission must consider all relevant circumstances existing at the time of the alleged abandonment, including evidence of the claimant's intention to abandon the work place as well as acts by which the intention is put into effect. *Id.*

*Id.* at ¶ 14-16.

## First Issue

{¶ 87} The first issue is whether the SHO's order of February 19, 2013 contains an abuse of discretion in finding that relator voluntarily abandoned the workforce at the time he left work at Cooper Tire on October 30, 2011. Relator contends that the finding is not supported by some evidence on which the SHO relied. The magistrate disagrees.

{¶ 88} Relator begins his argument by pointing out that the voluntary abandonment issue was raised sua sponte by the SHO at the February 19, 2013 hearing, and that the only evidence relied upon was relator's own hearing testimony. Relator argues:

[W]hen provided with an invitation from the SHO -- through the use of a leading question -- Reichley declined to affirm his intent to leave the work force *entirely*. Instead, he merely confirmed that he had left the work force for the *entirety* of 2011. Reichley's accurate testimony—that he left the work force for the "entire**ty**" of 2011—is "entire**ly**" different than leaving the workforce permanently as claimed by the SHO. This testimony fails to act as some evidence to support the Commission's finding.

(Emphasis sic.) (Relator's Brief at 15.)

{¶ 89} In the magistrate's view, relator posits a strained interpretation of the recorded exchange between the SHO and relator.

{¶ 90} Relator's statement "For the entirety, 2011" can be legitimately viewed as an affirmative response to the SHO's query "Left the work force entirely?" and that it began during the year 2011.

{¶ 91} It can be emphasized that the SHO's order of February 19, 2013 finds:

> This Staff Hearing Officer finds the testimony of Mr. Reichley clearly indicated that he left the workforce in 2011 without any intent to return to the workforce in a lesser, sedentary capacity. This Staff Hearing Officer finds Mr. Reichley abandoned the workforce and not merely the previous job.

{¶ 92} The SHO was not required to give relator's hearing testimony the strained interpretation that relator posits here. Moreover, to the extent that relator's hearing testimony can be given two legitimate interpretations, it is the commission and its hearing officers that weigh the evidence. Clearly, relator's testimony, as interpreted by the SHO, provides some evidence to support the finding of a voluntary workforce abandonment.

{¶ 93} Moreover, relator's hearing testimony, as previously discussed, cannot be viewed in isolation with his later hearing testimony on February 19, 2013. As earlier noted, a lengthy exchange occurred between counsel for Cooper Tire and relator. That exchange began with a question from counsel for Cooper Tire "would you be willing to do vocational retraining?" The SHO's description of relator's testimony as "equivocal" accurately describes the testimony. With respect to the question from counsel regarding a willingness to undergo vocational retraining, relator stated "I am not so sure, I am kind of on the fence, yes and no." Certainly, relator's response was equivocal.

{¶ 94} Significantly, during the exchange, relator states:

> And you're right about retirement, yes, I have made up my mind to retire, and also made up my mind years ago that I was going to start collecting social security at 62 and not wait until 70, because my dad died at 70 and I decided I was not going to do that.

(Tr. at 30.)

{¶ 95} Relator's statement can be divided into two parts. One, that he has made up his mind to retire, and two, he intends to start collecting social security at age 62.

{¶ 96} The SHO's finding that relator "went on to indicate he had no interest in returning to the workforce" is supported by relator's transcribed testimony.

{¶ 97} Based on the foregoing analysis, the magistrate concludes that the SHO's order of February 19, 2013 finding a voluntary abandonment of the workforce is supported by some evidence and does not constitute an abuse of discretion.

### Second Issue

{¶ 98} The second issue is whether the finding of a workforce abandonment in the SHO's order of January 27, 2016 that denied the second PTD application constitutes an abuse of discretion. That portion of the SHO's order of January 27, 2016 relevant to this issue is repeated:

> This Hearing Officer finds the Injured Worker's two week return to employment in October of 2014 did not cure his voluntary abandonment of the work force so as to establish his eligibility for temporary total disability compensation or permanent total disability compensation. The Supreme Court of Ohio in *State ex rel. McCoy v. Dedicated Transport, Inc.,* 97 Ohio St.3d 25, 2002-Ohio-5305 held that an Injured Worker who abandons his or her former position of employment will be eligible to receive temporary total disability compensation if he or she re-enters the work force and, due to the original industrial injury, becomes temporarily and totally disabled while working at his or her new job. This Hearing Officer finds no evidence that the Injured Worker became temporarily and totally disabled while working for R & R Chinchilla in October of 2014, including any request for payment of temporary total disability compensation contemporaneous to leaving this position. Thus, this Hearing Officer finds the Injured Worker did not cure his voluntary abandonment so as to establish his eligibility for permanent total disability should he be found to be permanently and totally disabled subsequent to October of 2014.

{¶ 99} In reaching his finding, the SHO relied heavily, if not exclusively, upon *State ex rel. McCoy v. Dedicated Transport, Inc.*, 97 Ohio St.3d 25, 2002-Ohio-5305, the syllabus of which provides:

A claimant who voluntarily abandoned his or her former position of employment or who was fired under circumstances that amount to a voluntary abandonment of the former position will be eligible to receive temporary total disability compensation pursuant to R.C. 4123.56 if he or she reenters the work force and, due to the original industrial injury, becomes temporarily and totally disabled while working at his or her new job.

{¶ 100} Applying its holding to the two cases before the court, the *McCoy* court explains:

It is important to note that this holding is limited to claimants who are gainfully employed at the time of their subsequent disabilities. In contrast, every case that we decided before Baker involved a claimant who had not only voluntarily abandoned the former employment, but who also had no job at the time of the subsequent period of disability. Thus, none of our prior decisions is affected by our holding today, and claimants in those situations will continue to be ineligible for TTD compensation.

We now proceed to apply our holding to the facts presented in the instant cases. In case No. 2001-0232, claimant McCoy voluntarily abandoned his former position of employment at Dedicated Transport on March 13, 1998, by virtue of being justifiably fired. He sought TTD compensation beginning on January 26, 1999, the date he was allegedly diagnosed with a disc herniation, or alternatively on June 28, 1999, the date of his surgery. However, there is no evidence in the record to suggest that McCoy was gainfully employed at these times or that he would have been employed if not for his industrial injury. To the contrary, the record reveals that McCoy's only employment from March 13, 1998, when he was fired, to June 28, 1999, when he underwent surgery, consisted of driving his cousin's truck on 12 to 15 separate days between February 3, 1999, and April 15, 1999 for $ 12 each day. Indeed, McCoy's attorney succinctly stated during a hearing held on October 29, 1999, before the commission's hearing officer that this "activity * * * did not constitute sustained gainful employment."

Accordingly, McCoy is not eligible to receive TTD compensation for the periods in question.

In case No. 2001-0406, claimant Brandgard voluntarily abandoned his former position of employment at America's

> Body Co. on September 10, 1999, when he was justifiably fired after testing positive for cocaine. He sought TTD compensation from September 24, 1999, the date he underwent surgery, to October 22, 1999, the date he returned to work for a different employer. However, there is no evidence in the record of this case to suggest that Brandgard was actually employed at his new job prior to September 24, 1999, or between September 24 and October 22, 1999.

*Id.* at ¶ 40-43.

Here, besides its citation to *McCoy*, respondent-employer cites to that portion of *Pierron* wherein the court notes that, in the years that followed his involuntary retirement from Sprint/United Telephone Company, "Pierron remained unemployed except for a brief part-time stint as a flower delivery person." *Pierron* at ¶ 4. That is, Pierron's brief part-time stint did not serve to re-establish eligibility for TTD compensation.

{¶ 101} In *State ex rel. Eckerly v. Indus. Comm.*, 105 Ohio St.3d 428, 2005-Ohio-2587, the Supreme Court of Ohio had occasion to further explain the *McCoy* holding:

> The present claimant seemingly misunderstands *McCoy*. He appears to believe that so long as he establishes that he obtained another job -- if even for a day -- at some point after his departure from Tech II, TTC eligibility is forever after reestablished. Unfortunately, this belief overlooks the tenet that is key to *McCoy* and all other TTC cases before and after: that the industrial injury must remove the claimant from his or her job. This requirement obviously cannot be satisfied if claimant had no job at the time of the alleged disability.
>
> In the case at bar, there is no evidence that claimant was employed in February 2003 when the requested period of TTC was alleged to have begun. To the contrary, it appears that claimant was almost entirely unemployed in the two years after his discharge from Tech II, earning only approximately $ 800 during that period.

*Id.* at ¶ 9-10.

{¶ 102} The magistrate recognizes that *McCoy* and its progeny, including *Eckerly,* are cases involving TTD compensation. That is, the cases do not adjudicate PTD compensation.

{¶ 103} Nevertheless, the magistrate finds that the syllabus of *McCoy* is applicable here where a claimant who has voluntarily abandoned the workforce seeks to reinstate his PTD eligibility by evidence of subsequent employment.

{¶ 104} As the SHO's order of January 27, 2016 finds, relator's brief return to employment in September and October 2014 does not show that relator permanently re-entered the workforce nor does it re-establish eligibility for PTD compensation. While it may be argued that relator was engaged in gainful employment during a four-week period from September 28 through October 25, 2014, relator did not remain at the job and he has presented no contemporaneous medical evidence that his quitting the job was causally related to the allowed conditions of the industrial claim.

{¶ 105} Accordingly, based on the above analysis, the magistrate concludes that the SHO's order of January 27, 2016 does not constitute an abuse of discretion in refusing to find that relator re-established eligibility for PTD compensation by working at R & R Chinchilla, Inc.

{¶ 106} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).